(No. 21131.—

ALVIN BIGGERSTAFF *et al.* Appellees, *vs.* MARY J. WICKS *et al.* Appellants.

*Opinion filed April 23, 1932.*

WILLIAM L. PIERCE, for appellants.

KNIGHT, PENNY & LUPTON, (PATRICK H. O'DONNELL, and THOMAS F. RYAN, of counsel,) for appellees.

Mr. JUSTICE HEARD delivered the opinion of the court:

Frank Biggerstaff, a resident of Boone county, departed this life March 3, 1930, leaving him surviving no wife but leaving appellees, Alvin Biggerstaff, Russell Biggerstaff and Ella May Ralston, his children, as his only heirs-at-law.

He made and executed on February 1, 1930, an instrument of writing purporting to be his last will and testament. This instrument was probated and entered of record on March 6, 1930, in the county court of Boone county, as his last will and testament, and letters testamentary were issued to John A. Greenlee as executor, who duly qualified as such. The appellees, Alvin Biggerstaff, Russell Biggerstaff and Ella May Ralston, filed at the April, 1931, term of the circuit court of Boone county their bill in chancery, and later an amended bill, to contest the will on the ground of an alleged lack of mental capacity to execute it and upon the ground of undue influence exercised over him by Mary J. Wicks, one of the beneficiaries named in the will, who, together with the executor of the will, were made parties defendant. The defendants answered the bill, denying lack of mental capacity upon the part of testator and denying that the execution of the will was obtained through undue influence. Issues having been joined by the pleadings the court entered an order submitting to a jury the issue of fact, "Was and is the writing admitted and read in evidence purporting to be the last will and testament of Frank Biggerstaff, the deceased, the last will and testament of said Frank Biggerstaff or not?" A trial was had upon this issue and the jury by their verdict answered this question in the negative. Motion for a new trial being overruled and a decree entered in accordance with the verdict, Mary J. Wicks, and John A. Greenlee, executor, have appealed to this court.

Many witnesses were called by the proponents, including the attending physician of deceased, who gave their opinion that while for the last year or two of his life deceased had become physically enfeebled he was of sound mind and that his mentality had not been impaired. No contrary showing having been made by the contestants, the court, upon motion of appellants, withdrew from the jury the question of mental capacity and orally instructed the

jury that the only issue they would pass upon in the case was whether it was or not the will of Frank Biggerstaff by reason of undue influence exercised upon him in its execution, and that all testimony offered showing statements made by Biggerstaff in his lifetime was before the jury, not as proving or tending to prove the substantive truth of any statement that he made but could only be considered by the jury in determining his strength or capacity of mind in the face of any undue influence, if there was such, and could only be considered in determining the strength or weakness or the amount of strength that Biggerstaff had mentally.

Appellant Mary J. Wicks went to live in the home of Frank Biggerstaff in 1903 as a servant. At that time the family consisted of Biggerstaff and his three children, one a girl about six years of age and two boys four or five years older. The daughter, Mrs. Ralston, left home about 1913 and the two boys left two or three years before that time. Mrs. Wicks continued to live in the home of deceased as his servant from 1903 until the time of his death, in 1930. During this time she not only did the work of a maid but assisted the testator in running and operating his farm, by milking cows, doing chores, operating a hay fork, mowing a lawn, driving teams in the field, delivering milk to the factory, doing the trading, buying goods and provisions for the house, assisting in his business transactions, sometimes getting his checks cashed at the bank and paying his current bills, making deposits in the bank for him and nursing him during his last illness. With the assistance of Mrs. Wicks testator did his farm work up to the Fall before his death.

Evidence, not competent upon the issue of undue influence, was received as to statements made by testator some considerable time prior to the making of the instrument in question that he did not intend to make a will. Evidence was introduced that upon one occasion when employees of

the telephone company were about to place a telephone pole in testator's front yard Mrs. Wicks insisted that the pole be not placed there, and, although testator had consented to such location, it was not placed there. On another occasion when a neighboring farmer had bought some cows on time without giving a note therefor, testator afterwards told the purchaser that Mrs. Wicks thought that a note should be given so that there would be something to show the amount due, and that thereafter he requested payment, saying that Mrs. Wicks wanted the money. A witness testified that on one occasion he talked about buying some horses; that he knew the horses were so high-spirited that nobody could handle them but testator, so when he was sick witness asked Mrs. Wicks if she thought he would sell them; that she said she did not know; that afterwards she said: "They are no good around here. He thinks so much of them he wouldn't let them go but I will try to talk it into him. He doesn't understand. I have to talk him into some of these things." At another time testator had made an arrangement with a neighbor to sell his farm. He changed his mind about selling and told the prospective purchaser that Mrs. Wicks had scolded him for selling and for that reason he wished to withdraw from the sale.

The will was drawn February 1, 1930, by Edwin A. Loop, an attorney practicing in Belvidere with William L. Pierce. He was also at that time city attorney of Belvidere and assistant Attorney General of the State of Illinois. He testified that he went to testator's residence, north of Caledonia, where the will was drawn, at the request of Pierce; that Pierce did not give him very explicit instructions; that he understood he was to draw a will and possibly a deed; that he took with him Jessie Weir, a stenographer in their office, and they were joined at Caledonia by John C. Ralston, who ran a grain elevator at Caledonia, and John A. Greenlee, an officer in the bank in Caledonia, whom Pierce had instructed witness to take along as wit-

nesses; that they were met at the door of testator's home by Mrs. Wicks, who took them into the front room and introduced witness to testator, who was sitting in a rocking chair; that Mrs. Wicks then left the room; that witness, after some conversation with testator as to his health, said, "I was sent up here by Mr. Pierce, who told me you wanted a will drawn;" that testator said "yes;" that witness said, "Now, just how do you want to leave your property?" and testator said, "I have three children; I want them to each have a share and I want Mrs. Wicks to have a share;" that witness then said, "Then you want to leave your property, share and share alike, between these four?" and testator said "yes;" that testator gave him the name of the person that he wanted for his executor; that after testator had given him the information witness dictated the will to Miss Weir; that she went into another room and typed it; that Greenlee, Ralston, Miss Weir and testator were present in the same room all the time he dictated the will and all were near enough to hear him; that there was no one in the room with Miss Weir while she was typing; when the notes were transcribed she came back to the room and witness read the whole will out loud to testator in the presence of the three witnesses before mentioned; that Mrs. Wicks was not in the room, having been out of it during the entire time; that witness said, "Is that the way you want it, Mr. Biggerstaff?" and testator said, "That is just exactly the way I want it;" that witness said, "Now, who do you want to witness this will?" and testator said, "I want Mr. Ralston and Mr. Greenlee," indicating them; that witness said, "It is well to have a third witness in case anything should happen to the others;" that testator said, "Yes, have your stenographer witness it also;" that testator took the will and signed it in the presence of the witnesses and himself, and each of the three witnesses signed it in testator's presence and in the presence of each other; that after the will was signed it was handed to witness by testator, who said

to take it and give it to Pierce and have it put in the safe and have it kept there; that the will was kept in the safe until testator's death; that while they were there witness had other conversations with testator; that he spoke about some repairs on the building, and that there was conversation about what he owed Mrs. Wicks; that testator said he wanted to leave her one-fourth of his property and in addition he wanted to take care of what he owed her; that she had been working there for a number of years and he wanted to take care of that; that he was not in a position to do it right then but wanted to give a note; that he said that she had the figures there; that after the will was signed she came in and witness told her to get her book; that she brought it and the figures were given as seven thousand and some dollars; that witness started to dictate a note to that effect, when either testator or Greenlee said a part of that had been taken care of in December at the bank, and Mrs. Wicks said, "Oh, yes; I have those figures;" that she showed them the book with the figures; that the amount due for the whole claim, less what had been paid her, was something like $4000; that testator said that she had been working there a great number of years; that he owed her this money; that he had not checked the interest but that she had and he would take her figures on it; that if anything was wrong with the figures he would check it up later, but said he would take her word for it; that he thought the figures were all right; that he said he knew the principal amount was all right but he simply had not figured the interest; that he said he had not paid her because he had not had ready money available; that Greenlee said he thought it was correct; that he checked part of the amount and found it right as far as he went, but he could not stay there all afternoon, checking; that in his first conversation with testator, when Mrs. Wicks was not present, witness said, "I understand you want to deed your farm to Mrs. Wicks and make a will;" that testator said, "No, I

don't want to deed her my farm; I want to leave my property equal between the four of them and give my note for what I owe her," and that he saw testator in Pierce's office about a month before. Greenlee testified that testator told him in December that he contemplated going to Belvidere and having a will drawn and asked witness if he would come down and witness it. Ralston testified that Loop was the first person who spoke to him about being a witness to the will, and that Mrs. Wicks did not at any time talk to him about being a witness. Ralston, Greenlee and Miss Weir each corroborated Loop's statement as to what was said and done at the time and place of the execution of the will, in every particular.

It is not enough to invalidate a will to show the existence of a confidential relation between the testator and the person charged with exercising undue influence and a dominating influence over the mind of the testator. It must also be shown that the influence operated on the mind of the testator at the time the will was executed and that the execution of the will was the result of such influence and not of the free will of the testator. (*Waterman* v. *Hall*, 291 Ill. 304.) Undue influence has been defined to be any improper or wrongful constraint, machination or urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely. (*Prinz* v. *Schmidt*, 334 Ill. 576.) The undue influence which will void a will must be directly connected with the execution of the instrument and operate at the time it is made. The influence must be especially directed toward procuring the will in favor of a particular party or parties, and it must be such as to destroy the freedom of the testator's will and render the instrument obviously more the offspring of the will of another or others than of his own. (*Hauptman* v. *Graehl*, 343 Ill. 128; *Applehans* v. *Jurgenson*, 336 id. 427; *Ray* v. *Koenigsmarck*, 329 id. 588.) Mere persuasion or

advice or the influence of affection is not an improper influence in securing the execution of a will. Undue influence which justifies setting aside a will must be such as to deprive the testator of his free agency, it must be such as to destroy the freedom of his purpose and render the instrument more the will of another than of his own, and it must be directly connected with the execution of the will and must operate at the time the will was made, producing a perversion of the testator's mind. Advice or persuasion will not vitiate a will freely and understandingly made. (*Greenlees* v. *Allen,* 341 Ill. 262; *Flanigon* v. *Smith,* 337 id. 572; *Pollock* v. *Pollock,* 328 id. 179; *Grosh* v. *Acom,* 325 id. 474.) Influence over a testator gained by affection and friendly attention to him is not regarded in law as undue influence. (*Waters* v. *Waters,* 222 Ill. 26.) If a testator possesses the required mental capacity he has the legal right to make an unequal distribution of his property among his heirs or give it entirely to strangers. *McGrady* v. *McGrady,* 298 Ill. 129.

The evidence as to the facts with reference to the execution of the instrument in question is uncontradicted. The evidence of the scrivener and of the witnesses to the will clearly shows that the testator knew the contents of the will, that he dictated its terms and that he executed it understandingly, and while it may have coincided with the wishes of another, of which there is no evidence, it expressed the testator's intentions exactly. The verdict of the jury upon the question of undue influence was so manifestly against the weight of the evidence that it must be set aside.

The decree of the circuit court is reversed and the cause remanded.

*Reversed and remanded.*