(No. 24680.—

FRIEDA SCHOON QUATHAMER, Appellant, *vs.* HENRY SCHOON, Exr., *et al.* Appellees.

*Opinion filed February 15, 1939.*

GEORGE W. SPRENGER, for appellant.

BARNES & MAGOON, for appellees.

Mr. JUSTICE STONE delivered the opinion of the court:

Appellant filed, in the circuit court of Woodford county, a complaint to contest the will of one Jurgen Schoon. She alleges that she was a daughter, by adoption, of Schoon, who, on April 29, 1936, executed a purported will; that she was his only child and heir-at-law, but, by the purported will, she was to receive but $25 in cash. Schoon, at the time of his death, owned 80 acres of land in Woodford county and also about $3000 in personal property. Under this will this land was devised to testator's brother, Henry Schoon, subject to the payment of two legacies of $1000 each, which were made a lien upon the real estate. Certain other small bequests were made and Henry Schoon received the residue of the estate.

The ground on which it is sought to set the will aside is want of testamentary capacity on the part of the testator, and undue influence on the part of the beneficiary, Henry Schoon. The answer denied the allegations of the complaint concerning testamentary capacity and undue influ-

ence and also denied that the plaintiff was legally adopted by Schoon. On hearing, the court, at the close of plaintiff's evidence, withdrew the issues of testamentary competency of the testator and undue influence from the jury and directed a verdict sustaining the will. Appellant seeks review contending that there was sufficient evidence to go to the jury on those issues.

A rule governing proof of undue influence sufficient to submit that issue to a jury, is as follows: Undue influence which will invalidate a will must be such as to deprive the testator of free agency or destroy the freedom of his will and render it more the will of another than his own. It must be operative at the time the will is made. Mere advice or personal persuasion or influence resulting from affection does not constitute undue influence sufficient to set aside a will freely and understandingly made. (*Ughetti* v. *Ughetti,* 334 Ill. 398; *Ray* v. *Koenigsmarck,* 329 id. 588; *Jones* v. *Worth,* 319 id. 235; *Goff* v. *Gerhart,* 316 id. 513.) Among the rules governing mental competency of a testator are the following: The law presumes that all adults are of sound mind until the contrary is proved. (*Grosh* v. *Acom,* 325 Ill. 474.) A testator, in making his will, has a right, if he is mentally capable, to make unequal distribution of his property among his heirs, or to give it to strangers, and the fact that there is inequality of distribution does not of itself have the effect of invalidating his will. (*Biggerstaff* v. *Wicks,* 348 Ill. 129; *Pollock* v. *Pollock,* 328 id. 179.) To be mentally capable of making a will the testator must know who are his heirs, know the extent of his property and in what manner he desires to dispose of it, and the fact that certain relatives are excluded without any reason therefor, or because of prejudice, does not indicate want of mental capacity, if such does not amount to an insane delusion. (*Seavey* v. *Glass,* 315 Ill. 611.) An opinion of a non-expert witness that a testator is not of sound mind and memory is entitled to no weight where he states no

facts or circumstances which could induce a reasonable belief of the testator's unsoundness of mind. *Brainard* v. *Brainard*, 259 Ill. 613; *Graham* v. *Deuterman*, 244 id. 124.

In determining whether the chancellor was justified in withdrawing the issues of undue influence and testamentary capacity from the jury, this court will examine the evidence to see whether, granting to the plaintiff the benefit of all of the evidence in her favor in its most favorable aspect, such evidence tended to prove such issues. First, concerning the issue of undue influence: None of the witnesses called for plaintiff testified to any facts which tend to establish that Henry Schoon occupied a position of dominance over the testator. He was not shown to have had anything to do with making the will. The only testimony concerning him, appearing in the record, is to the effect that the testator stated, after making his will, that his brother Henry wanted him to go to town and to let his (Henry's) son move onto the place. This same witness stated also that the testator had previously said to him that Henry wanted him to make a will and that Henry would take care of him, the testator, the rest of his life. There is nothing tending to indicate that the testator was not exercising his own free will in executing the will as he did. Nothing in the record shows that his brother Henry ever transacted business for him, or ever advised him about his business, other than his suggestion that he move into town and buy a place there, which the testator did some time prior to making his will. There is no evidence that Henry dominated or controlled him. So far as the record shows he attended, alone, to the business of purchasing the house and making the will, as he appears to have done in other business transactions. His wife had died some years previously and the evidence shows that he was lonesome and dissatisfied with living alone. Apparently, from the record, plaintiff was not living with him. The evidence showed that about two months after making this will he committed suicide. The chan-

cellor was justified in removing from the consideration of the jury the issue of undue influence.

Concerning want of testamentary capacity, several witnesses gave the opinion either that he was not sane, or that he was "not just right." One witness testified that he showed his emotions easily; that he was nervous and lonesome, and that he cried when talking of his condition. Another witness testified that she saw the testator frequently before his wife died, but that she had not seen him frequently thereafter until the morning on which he committed suicide; that when she saw him he acted as though he was nervous; that he had told her he was worried and that on the morning of taking his life he had told her that he did not like to move to town; that he preferred to stay on the farm; that at times he would get out his Bible, lay his head on it and cry until he fell asleep; that after he moved to town she didn't see much of him. She thought he wasn't himself at the time he killed himself. Another witness and her daughter testified to having seen him after he had moved into town; that he told them that Henry had made him come to town and buy the place the testator was living in; that he was nervous and seemed to have failed physically; that he was not cheerful; that he had acted more cheerfully when his wife was living and seemed more satisfied on the farm.

Another witness stated that he was in business and that he had known the testator for many years and transacted business with him. He saw him a few weeks before he died; that he came there to make a purchase; that his appearance and conduct were different from what they were before his wife died; that he seemed to be melancholy, despondent and unsatisfied and was rather rambling in his conversation as to his home life. This witness said he didn't think testator was of sound mind. He, however, testified that testator knew what he wanted when he came to make the purchases, and paid for them, and that he

wouldn't say testator was crazy; that he certainly had mind enough to know what he wanted.

Another witness testified that he had helped the testator move from the farm to Lowpoint, where he had bought a house; that he occasionally went to see the testator and the testator visited him, and that he had several conversations with him about his will after his wife's death. The last time was not over a few weeks before his death. He said then that he didn't know whom to will his property to but that it would cause trouble no matter who got it. This witness stated that he didn't mention his brother Henry. This witness also testified he saw him on the evening before he died; that the testator came to his house and they talked about different things. His condition seemed to be all right; he seemed a little nervous and seemed a little worried about the death of his wife, but that that was all, and that he didn't see much difference in his condition, but that he was getting older and more nervous like anybody else does.

No witness testified that testator was not able to transact ordinary business but the evidence shows that he did rent his farm to his neighbors; that he made his own purchases; purchased the house he moved into in Lowpoint, and, in general, transacted his business without any assistance from anyone.

The rule is announced in the early case of *Francis* v. *Wilkinson,* 147 Ill. 370, that where a man has sufficient mental capacity to transact ordinary business and act rationally in the ordinary affairs of life, he has sufficient mental capacity to dispose of his property by will. In *Forberg* v. *Maurer,* 336 Ill. 192, it is said that a person who is capable of transacting ordinary business is capable of making a valid will, and the strongest evidence of testamentary soundness of mind and memory is positive testimony that he transacted his ordinary business intelligently. While, as was said by this court in *Brainard* v. *Brainard, supra,* a

witness who is not an expert may detail facts and circumstances from which the jury might form an opinion, and then give his own opinion from such facts and circumstances, yet where the witness states no facts or circumstances which could induce a reasonable belief that the testator was not mentally capable of making a will, such opinion evidence is of no weight. We are of the opinion that this rule applies here. We discover no evidence in this record upon which an opinion that the testator was incompetent to make a will can reasonably be based, and the chancellor did not err in withdrawing that issue from the jury. It, therefore, becomes unnecessary to consider other questions raised in the case.

The decree of the circuit court is affirmed.

*Decree affirmed.*