(No. 32644.—

MARIAN HEIDEMAN, Appellee, *vs.* WILLARD V. KELSEY, Exr., *et al.,* Appellants.

*Opinion filed March 23, 1953.*

HEMPHILL & KELSEY, of Carlinville, for appellants.

WILLIAM J. BECKER, of Clayton, Mo., and RINAKER, SMITH & HEBRON, of Carlinville, for appellee.

Mr. JUSTICE BRISTOW delivered the opinion of the court:

This appeal arrives here from the circuit court of Macoupin County, wherein a decree was entered pursuant to a jury verdict setting aside the last will and testament of Charles Avery Hilliard. The sole appellee is Marian Heideman, whom we will hereafter refer to as plaintiff, and the appellants are the decedent's brother, two sisters and Willard V. Kelsey, executor of the will in contest, whom we shall call defendants.

The testator, Charles Avery Hilliard, departed this life on June 7, 1950, at the age of 85. He left surviving his daughter, Marian Heideman, a brother, Frank Wyman Hilliard, and two sisters, Leah Hilliard and Gladys H. Gates. By the terms of the will, Frank Wyman Hilliard was devised all real estate, consisting of a farm, and all the farm equipment, machinery and tools used in connection therewith. The residue of his estate was divided into six equal parts, and was disposed of as follows: two parts to Frank Wyman Hilliard, two parts to his sister Leah Hilliard, one each to his sister Gladys H. Gates and his daughter, the plaintiff. The record contains very little

about the family relation, and particularly is it silent with reference to any reason the testator might have had for leaving his only child just a minor share of his estate.

The complaint in this proceeding contained two counts, one charging mental incapacity, and the other undue influence. The court ruled that there was no proof in support of count II, and it was withdrawn from the jury's consideration. No quarrel is presented here by appellee concerning this determination. The jury found upon the single issue presented to it that the will in question was not the last will and testament of Charles Avery Hilliard. The trial court overruled defendants' motions for judgment notwithstanding the verdict and for a new trial. This appeal challenges the correctness of those two rulings.

The testator spent most of his life on his farm, which is located about two miles east of Brighton, Macoupin County. During the latter years his sister Leah Hilliard lived with him. In the early part of October, 1949, Hilliard and his sister Leah went to live in St. Louis, Missouri. While there, he entered the Deaconness Hospital October 11, 1949, and was discharged therefrom October 21, 1949. He and his sister then went to live in an apartment at the Gatesworth Hotel, residing there until April 16, 1950. Again he entered the Deaconness Hospital, and thereafter, on April 22, 1950, he entered Maplewood Nursing Home, where he was a patient until his death on June 7, 1950.

In addition to his interests in farming, Hilliard was the president of the First National Bank of Brighton, for seventeen years. In that capacity, however, he did not manage or direct the banking business, but regularly attended and presided at all bank meetings. He engaged, for himself, very extensively in the purchase and sale of stocks, bonds and securities generally classified as gilt-edged and safe. For a man of his years, Hilliard was very active; however, he did suffer some disability, such as poor vision, which caused him to discontinue driving his car the last five years.

In 1945, he fell out of a peach tree and some of his friends thought that they noticed a diminution of his physical vigor and sociability after that.

A decision of the issues presented on this review demands that we detail and weigh the evidence pertaining to Hilliard's condition on January 10, 1950, the date of the execution of the purported last will. The plaintiff relies very strongly upon the testimony of Dr. J. Fred W. Clark, who treated Mr. Hilliard from 1935 to March 1, 1948. Dr. Clarence E. Mueller was testator's attending physician from October, 1949, tó the date of his death. Both doctors agree that he was suffering from constipation and arteriosclerosis. They disagree, however, on the question as to how much damage these ailments did to testator's mental condition. Although Dr. Clark did not see the testator after March 1, 1948, he was definitely of the opinion that Charles G. Hilliard did not have sufficient mental capacity to transact ordinary business on January 10, 1950. This opinion was predicated upon the following factual history: Testator, in 1947, was worried about the infrequency of his bowel movements; he was frequently mistaken about simple matters, such as his age, or when his bowels had last moved, or the date of the removal of his teeth; he was confused and apprehensive, but witness admitted that he was orientated as to time, place and persons; he was unable to take care of his medicine; his mental sickness was described as a one-track mind; he was a feeble and confused old gentleman; he was childish and incompetent to handle any business affairs and should always be attended by someone to look after him; the symptoms of brain disease caused by hardening of the arteries present in Hilliard were forgetfulness, headaches and blurred vision. Dr. Clark admitted that testator did not have senile dementia; that he had no hallucinations or delusions, nor was unduly suspicious of anyone; and that it was his opinion he was "simply not competent to transact ordinary business."

In light of the foregoing testimony we are required to rule adversely to defendants' contention that it was error for the trial court to refuse to enter judgment notwithstanding the verdict. It is our opinion that the testimony of Clark makes it a *prima facie* case, sufficient in itself to warrant the trial court submitting the cause of mental incapacity to the jury. The motion for a directed verdict and the motion for judgment notwithstanding the verdict present a question of law as to whether, when all of the evidence is considered, together with all reasonable inferences from it in its aspect most favorable to the party against whom the motion is directed, there is a total failure or lack of evidence to prove any necessary element of the plaintiff's case or the defendants' defense. *Tidholm* v. *Tidholm*, 391 Ill. 19; *Hughes* v. *Bandy*, 404 Ill. 74.

Let us now consider briefly the testimony of other witnesses appearing on behalf of the plaintiff. Jerome W. Long, an auctioneer and filling-station operator, knew the testator for 45 years. He testified that after 1945 Hilliard was in bad shape physically; that he did not seem to care to talk as he had before that date; that in the summer of 1949 he saw the testator in a store and testator informed him that he, Hilliard, was "no good" and walked out forgetting to get a loaf of bread; that in 1945 or 1946 he asked about a cattle sale and before witness had finished telling him what the cattle had averaged, he asked about the price of hay or grain; and that in his opinion the testator was insane in the summer and fall of 1949.

Martin Bloomstein, a mechanic, who knew testator for 35 years, testified that the older he got the more slovenly he got; that in August, 1949, he was not neat or clean like he used to be, and the front of his clothes were "slobbered up." He had no opinion as to the testator's mental capacity.

John L. Ash, a rural mail carrier, knew testator for 40 years. He observed that in the early years when Hilliard

came to town he would be pretty well dressed and cleaned up, but in later years these habits began to change and his clothes were baggy in the back and dirty, and his face and hands were dirty; that in March, 1949, testator failed to recognize him in front of the telephone office in Brighton, and thought he was Dr. Ash, witness's father, who had been dead ten or eleven years; that he saw him about a week after that conversation in front of the harness shop in Brighton, and that testator knew him and asked him to come out to his farm and hunt coons which were very destructive; that there was nothing in the last conversation he had with testator that would make him question his mental capacity.

Arvice Hastings, maintenance supervisor of an aviation company, met testator in 1940 when he went to testator's farm to install a saw and saw wood. At that time the testator helped him saw wood, and in 1947 he took some lumber to testator's farm to store, and testator showed him where he wanted it put. In the same year he cut some poles in testator's pasture, and he went with him and pointed out the trees he wanted cut. In the latter part of 1947 he was at testator's farm to install a different motor on the wood saw, and the testator indicated a bunch of old fence posts, limbs and other stuff piled up by the trees that he wanted cut. One time when he saw the testator in 1948 he reported that he was not feeling well. In 1940 he seemed strong for his age, but in 1947 he appeared much weaker. This witness had no opinion about testator's mental capacity.

William Hare encountered testator on two occasions in 1945 when he was installing a telephone line for him. He testified that on the second occasion he borrowed a gun from him for the purpose of hunting; that after he had gone a short distance from the house he returned realizing that he did not have a hunting license; that the testator asked him who he was and what he was doing there, and when he told him it more or less settled the matter. He

did not think the testator had good vision, and thought that was possibly the reason why he did not recognize him. This witness expressed no opinion as to testator's mental capacity.

Then there were three witnesses, Madeline Downen, Arnold H. Downen and Mary E. McIntyre, all of whom were associated with the Maplewood Nursing Home that testator entered on April 22, 1950. In effect, all three of these witnesses testified that the testator's physical condition was weak, and that his mental condition was not very good when he was brought into the nursing home; that his conversation was disjointed; that he later made many efforts to run away; that it was difficult for them to restrain testator; that he did not want to say in bed and would frequently go outside in his pajamas; that he had to be fed, and he was not able to control the normal functions of his body. It is strenuously urged here that it was error for the court to admit the testimony of these three witnesses. Admittedly, they did not know Hilliard before April 22, 1950. Supporting this contention the defendants rely upon what this court said in *Knudson* v. *Knudson,* 382 Ill. 492, 46 N.E. 2d 1011 : "The rule as to proof of mental competency requires that such proof, to be competent, relate to a time at or near the time of the making of the will. Evidence of mental condition at other times, unless it can be seen that it tends to establish the condition of the testator at the time the will was actually executed, is wholly inconsequential."

Although there is little, if anything, in the record that would indicate that Hilliard displayed, on January 10, 1950, any of the behavior peculiarities described by the three persons from the Maplewood Nursing Home, we are unable to say that their testimony was inadmissible, but it is of slight probative value.

The testimony adduced on behalf of the defendants is strong and convincing, and its compelling force would be demonstrated in no other way than to relate it rather fully.

Dr. Clarence E. Mueller was the testator's personal physician from October 11, 1949, to the date of his death, and it was his opinion that he was of sound mind on January 10, 1950, basing his opinion upon the following facts: that Hilliard showed no evidence of being confused or disorientated; that he talked intelligently on subjects unrelated to his own personal health and medicine; that he discussed his Masonic lodge affiliation which had lasted for fifty years; he discussed frequently the extent of his farms, the size of them, the work that he had been able to do prior to coming to St. Louis, such as chopping wood, repairing fences and working on the barn; he also related his experiences as a member of the board at the bank in Brighton; his physicial condition generally was good; he suffered from arteriosclerotic cardiovascular disease, which was not considered out of proportion in a man of his age; and he did not observe that the testator was short of memory or that he was unable to recall the past adequately. Dr. Mueller further observed that during the hospitalization of the testator after April 16, 1950, his mental state had changed considerably; that he was confused and disorientated very much and was very difficult to control and keep in bed; that at times he was completely out of contact with his environment and did not seem to recognize people readily; that this sudden change in his physical and mental condition was attributable to a diminished blood supply to the brain tissues and diminished potency of the arteries, both being traceable to arteriosclerosis.

Allen Jones was a tenant on testator's farm. He testified that he rented it from the testator in September, 1948, and that Hilliard drew up the lease by which he was to pay $240 a year rent, one third of the crop, and half of the hay. The house they lived in was about 100 yards northwest of the house in which the testator lived with his maiden sister, Miss Leah Hilliard. With reference to testator's activity on the farm, he testified that Hilliard

advised him about which fences needed to be repaired and about the hiring of men; that he would saw wood with a hand saw, split it nearly every day, and do all of the work in connection with taking care of the yard and repairing the barn. The witness told about one occasion on which Hilliard climbed upon the roof and repaired the barn by himself. He testified that he was with him daily until he left for St. Louis in November, 1949; that he would go to town and attend to the purchase of groceries, bank meetings, depositing checks, etc.; that his eyesight was not too good; that he was a little stooped for his age but pretty spry; that he handled his own business, drew up the lease, and collected personally what was due him from the farm. It was his opinion that the testator was able to transact business. To like effect was the testimony of Jones's wife, Audrey Jones.

D. W. Schroeder, a merchant in Brighton, had known the testator all of his life. He said the testator had done business with him; that he was a stockholder of the First National Bank in Brighton; that he saw testator there on January 10, 1950, and had a conversation with him at that time; that it was his opinion based upon business transactions and conversations he had had with him that Hilliard was capable of transacting business up to and including January 10, 1950. He further testified that for his age he thought Hilliard's physical condition was very good; that he walked about as good as anybody does; that he understood that he had trouble with his eyesight; that he had voted his stock on January 10, 1950, at the stockholders' meeting; and that during the year 1949, he had occasion to interview him when he sold him some nails and some mixed clover seed; and that in 1948 or 1949 he had a discussion with him with reference to the repair of a pump.

Vernon K. Storm, who is associated with the new-business department of the St. Louis Union Trust Company, said that he first met the testator in 1948 at his home

on the farm east of Brighton and at that time had a conversation with him; and that his health appeared to be very good for a man of his age. He said that he next saw Hilliard in St. Louis at the Gatesworth Hotel on December 29, 1949; that the testator had called him to talk over his various securities and said that the testator was desirous of making some small gifts that would be exempt from income tax. It was there discussed that the gift must be less than $3000, and the testator told him that he was desirous of making gifts of some stock. He recalled one that he mentioned was that of the St. Louis Union Trust Company. The witness further testified that it was his desire to have the testator nominate his trust company as an executor or trustee of his estate, and the testator replied that the company was doing business with the bank of which he was president, and that he thought that was enough. It was witness's opinion that the testator was of sound mind, and that he was capable of transacting ordinary business in which his interests were involved.

Clark Hinderlichter, an investment man with the St. Louis Union Trust Company, had known testator over a period of years. His company had acted in an investment advisory capacity for the bank of Brighton, and he attended many of the board meetings of that bank when the testator was in attendance and presided as president. He last saw the testator on December 29, 1949, at the Gatesworth Hotel, and on this occasion the testator had a list of his securities and sought to have witness tell him about each one of them. Hinderlichter testified that Hilliard appeared to understand well the nature and extent of his holdings and was desirous of information concerning future prospects of each of them. It was the witness's opinion, based upon his conversations and observations of Hilliard, that he was capable of transacting business.

Warren G. Strohbeck had been connected with the First National Bank of Brighton for many years. He stated

that during the years 1948 and 1949 he not only saw the testator at board meetings, but, on various other occasions he had an opportunity to observe and converse with him; that testator requested witness to sign his will as a witness; and that it was his opinion that the testator had the capacity to know what was his property and also who constituted the members of his family.

Gertrude Lucker was another witness to the will and is an employee, as bookkeeper, of the First National Bank of Brighton. She would see the testator in the bank frequently when he was making deposits, at which time she would have an opportunity to, and did, visit with him. It was her opinion that testator was capable of transacting his own business on January 10, 1950.

Albert H. Michenfelder testified that he was employed by Newhard Cook & Company of St. Louis, who are members of the New York Stock Exchange; that he was a salesman whose duty it was to undertake to interest people in the purchase of investments that his company had for sale; that he became acquainted with the testator about thirty years ago and began calling at his farm for business purposes around 1942, and he considered Hilliard's business a very active account; that he would see him with reference to the purchase or sale of securities at least every three months. The witness stated that there was no question but what testator understood the merits and demerits of the stocks that he owned; that he exercised the best of judgment in the buying and selling of them; that the last time he saw him was at the Gatesworth Hotel which was about six months before he passed away; and that on that occasion he appeared exceptionally alert and intelligent. It was his opinion that the testator possessed sufficient mental capacity to know the members of his family and to transact normal business. .

Lloyd Well was engaged in the trucking business and was formerly an agent of the Standard Oil Company, and

since 1937 the testator had bought his tractor fuel and farm needs from him. Well also operated the Brighton elevator, and bought nearly all the farm products Hilliard sold, and sold him limestone and fertilizer for the farm. These business transactions were between the years 1942 and 1947, and, after the latter date, Well continued to do trucking service and carpenter work for Hilliard. His last contact with the testator was in October, 1949, when he delivered $188 worth of limestone which Hilliard bought and paid for himself. Well also testified that he did carpenter work for him and Hilliard would direct and supervise it, and help in the measurement of the sills and the sawing of the wood; that he assisted in putting the roof on the barn; that as late as 1949 he could observe very little change in his physical condition; that his mental condition was good; and that he was capable of transacting ordinary business.

Harold C. Chase was the operator of a garage and had been acquainted with the testator all of his life. Hilliard was in the habit of stopping in his place of business every time he came to town; and each time he would have occasion to visit and converse with him rather extensively. He did some work for the testator in 1947 and 1948, and observed no change in his mental condition in the years 1948 to January 10, 1950. It was his opinion that Hilliard was capable of transacting ordinary business.

F. G. Scheffel, a resident of Brighton, engaged in the mercantile business, selling groceries, hardware, shoes and dry goods, and also a director of the First National Bank, testified that the testator traded at his store at least once a week which, combined with the bank meetings, gave him an opportunity to see and observe the testator frequently; that he did not notice any change in his physical or mental condition in the last three years prior to January 10, 1950; that when he came in to buy groceries he would occasionally have a list, but frequently he would depend upon his mem-

ory to make his purchases. In his opinion he always knew how to handle his own business.

Maurice L. Bentley testified by deposition, which was taken at the instance of the plaintiff and read into evidence by the defendants, that he had known the testator all of his life; that he had left Brighton in 1941 and seen Hilliard only once after that time; that he saw him the last time at the Gatesworth Hotel the first Sunday in January, 1950, and that he did not notice anything unusual about the testator and was of the opinion that his mind was alert.

Defendants' exhibit No. 28 is a letter dated December 29, 1949, written by Charles A. Hilliard to Willard Kelsey, his lawyer, at Brighton, which is as follows: "I received your letter okay with a copy of proposed will. Have not had a chance to study it much yet. I want to compare it with first copy which was signed and which you have. Maybe I will be satisfied with one of them. Also please send me your bill. Date the bill 1949. I expect to come up to the meeting January 10, if weather will permit. Yours, Charles A. Hilliard."

Defendants' exhibit No. 30 is a letter dated January 5, 1950, written by Charles A. Hilliard to Willard Kelsey, Brighton, which is as follows: "I am sending one of the copies of the will you wrote for me sometime ago for some changes. I think it will be best to rewrite the first page entirely making the changes I have indicated. I expect to be in Brighton for the bank meeting on the 10th of January and you can bring it down with you and we will get it signed there. Yours truly, Charles A. Hilliard."

It will be observed that defendants' exhibit No. 28 was written only twelve days and defendants' exhibit No. 30 only five days before the execution by Hilliard of his last will. These two exhibits lend much strength to the defense in this case. They demonstrate rather conclusively that the testator was not only capable of thinking clearly but that

he was able to express himself and write with remarkable coherence and conciseness. A photostatic copy of these letters in the record reveals a neat composition with even spacing and excellent penmanship.

On a motion for new trial the court may weigh the evidence for the purpose of determining whether the verdict is contrary to the weight of the evidence, and, if the court so finds, a new trial should be granted. *Hunt* v. *Vermilion County Children's Home*, 381 Ill. 29, 44 N.E. 2d 609.

It is our opinion that the proof in this case demonstrates that Hilliard was a person with adequate testamentary capacity on January 10, 1950, and the jury's verdict finding to the contrary is against the manifest weight of the evidence. A testator has the right, if he is mentally capable, to make unequal distribution of his property among his heirs, or to give it to strangers, and the fact that there is inequality of distribution does not of itself have the effect of invalidating his will. *Quathamer* v. *Schoon*, 370 Ill. 606, 19 N.E. 2d 750.

It was error for the trial court to deny defendants' motion for new trial.

*Reversed and remanded.*