(No. 46600

PIONEER HI-BRED CORN COMPANY OF ILLINOIS, Appellee, v. NORTHERN ILLINOIS GAS COMPANY, Appellant.

*Opinion filed June 2, 1975.*

RYAN, J., took no part.

Justin A. Stanley, George W. Hamman, Robert A. Helma, Steven M. Rasher of Mayer, Brown & Platt, of Chicago, and Brunon J. Komosa of Jares & Komosa, of Chicago, and Roger V. Pierson, of Princeton, for appellant.

Johnson, Martin & Russell, of Princeton, and Clausen, Miller, Gorman, Caffrey & Witous, of Chicago (Watts Johnson, John J. Witous and James T. Ferrini, of counsel), for appellee.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

The plaintiff, Pioneer Hi-Bred Corn Company of Illinois (Pioneer), brought this action in the circuit court of Bureau County against the defendant, Northern Illinois Gas Company (Northern), to recover damages for property which was destroyed when escaping gas exploded, causing a fire in one of Pioneer's buildings. The complaint contained five counts: count I alleged negligence, count II alleged willful and wanton conduct, count III alleged breach of implied warranties of merchantability and fitness for a particular purpose, count IV alleged strict liability, and count V alleged breach of express warranties. The plaintiff withdrew count II, and at the close of all the evidence the trial court dismissed counts III, IV, and V. Count I was submitted to the jury, and the jury returned a verdict for the defendant.

The appellate court reversed, with one judge dissenting. The majority held that the trial court erred in refusing to give instruction No. 14 and in dismissing count III. (16 Ill. App. 3d 638.) We granted leave to appeal.

On this appeal, Northern argues that the trial court properly refused instruction No. 14 and properly dismissed count III. By way of cross-appeal Pioneer argues that the trial court improperly refused instruction No. 15 and erred

when it restricted the redirect examination of one of Pioneer's witnesses.

Pioneer owns and operates a hybrid seed corn processing plant located north of Princeton, Illinois. At this plant, three buildings are used for drying corn. The building which burned contained eight drying bins; each bin was connected to a portable gas operated dryer. With one exception, each dryer was in turn connected to a gas standpipe by a 10-foot rubber hose. The dryer where the explosion occurred was connected to the standpipe by a 6-foot hose and a 10-foot hose which had been coupled together.

In 1966, Northern purchased the Princeton Gas Company, which had previously serviced the area. In the summer of 1966, John O'Reilly, a marketing engineer for Northern, visited Pioneer's plant in order to acquaint himself with Pioneer's equipment and to determine Pioneer's probable gas needs. He examined the name plates on Pioneer's equipment, including the dryers, in order to make a general judgment as to the amount of gas the equipment would require. He testified that the name plates on the dryers indicated that they were capable of withstanding 250 pounds of pressure on a continuous working basis. O'Reilly recommended that Pioneer be supplied with gas at a pressure of 45 pounds per square inch because information supplied by the manufacturer of the burners which were used in the dryers indicated that the equipment would require approximately 45 pounds of inlet pressure. On September 19, 1966, Northern and Pioneer entered into a contract which provided that Northern would supply gas at a pressure of "approximately 45 p.s.i."

Gas flowed from Northern's pipeline into a meter house which was owned by Northern but located on Pioneer's property. If the pressure in Northern's pipeline was greater than 45 p.s.i., regulators in the meter house reduced the pressure to 45 p.s.i. The gas then flowed from

the meter house into Pioneer's underground pipes and eventually to the standpipes and the hoses connected to the dryers.

In the fall of 1967, Pioneer complained to Northern that it was not receiving enough pressure to operate its dryers at the temperatures needed to dry the corn. John O'Reilly and Richard Bergeson, Northern's operating supervisor in charge of the pressure department, went to Pioneer's plant and discovered that there was only 25 to 30 pounds of pressure at the meter house. This happened because the gas main that serviced Pioneer was so regulated that the maximum pressure could not exceed 75 p.s.i.; as the outside temperature got colder, more gas was used by customers who were upstream from Pioneer, which decreased the pressure at Pioneer's property.

After O'Reilly and Bergeson determined that the pressure was substantially below 45 p.s.i., they met with Fred Gross, a production superintendent for Pioneer. They told Gross that the only way they could increase the pressure was to bypass the regulators in the meter house. This would immediately increase the gas pressure by five or six pounds, but without the regulators, the pressure of the gas in Pioneer's system would increase as the pressure of the gas in Northern's pipeline increased. Gross testified that he indicated to O'Reilly and Bergeson that the plant manager, Melvin Kensinger, would have to make the decision to bypass.

O'Reilly, Bergeson and Gross examined some of Pioneer's dryers before they talked to Kensinger. O'Reilly testified that they examined one or two of the portable dryers and that they examined the dryers to determine if this type of equipment could withstand a pressure "higher than normal metering pressure." Bergeson testified that they examined one or two hoses on the portable dryers. Gross's account of the examination was that O'Reilly and Bergeson walked around the building while the dryers were in operation.

O'Reilly and Bergeson then told Kensinger that the only way they could increase the pressure was to bypass the regulators. They also told him that if they did so and gas usage by other customers decreased, then the pressure would increase up to a maximum of 75 pounds. Kensinger testified that he asked if any of his equipment would be damaged by increased pressure and was told that the only possible damage would be to the gas pressure gauges on the dryers, which had been designed to record a maximum of 60 pounds. O'Reilly testified:

> "We told the customer if he agreed his equipment could stand a pressure higher than 45 pounds which could occur during periods of low flow, we could bypass our regulators ***."

Bergeson testified that he asked Gross if the equipment could handle 75 pounds, but he did not believe that he received an answer. Kensinger decided that the regulators should be bypassed.

Northern employees bypassed the regulators on September 27, 1967. The weather became warmer, the gas pressure increased, reaching a maximum of 74¼ p.s.i., and, at the request of Pioneer, the bypass was removed on October 2. On October 12, Pioneer again complained about low pressure and at 3 p.m. on that date the regulators were again bypassed.

When Louis Bartman, Pioneer's employee in charge of operating the dryers on the night shift, arrived at work at 6 p.m. on October 12, he noticed that each of the dryers was running at too high a temperature and that the two hose lengths on the dryer which was eventually involved in the explosion were vibrating and jumping about ½ inch off the ground. To reduce the heat he adjusted the temperature control valve on each dryer on his first trip, "and I was thinking of calling Fred Gross. It seemed the second time I was coming around it wasn't doing any good so I speeded up and come around to see if they were all as high because I was going to call Fred because it didn't look good to

me." At about 7:20 p.m., he heard the hose blow. He immediately ran to the standpipe and attempted to shut off the gas, but before he was able to do so an explosion occurred and the fire resulted.

The gas pressure in the hoses in the three hours preceding the explosion varied between 53 and 63 p.s.i. There was testimony that additional pressure had built up in the hose because control valves in the dryers kept clicking shut when the dryers reached a certain temperature. It was stipulated by the parties that the damages resulting from the fire amount to $211,712.

The first issue raised is whether the appellate court erred when it held that the trial court erred in refusing to give instruction No. 14, which stated:

> "Plaintiff claims that it sustained damage while exercising ordinary care, and that the defendant was negligent in one or more of the following respects:
>
> A. Installed bypass around a pressure regulating device permitting the gas pressure to fluctuate above 45 pounds per square inch.
>
> B. Failed to maintain a reasonably constant pressure on the gas line serving the plaintiff.
>
> C. Failed to exercise ordinary care and caution in the distribution of gas commensurate with the requirements of the plaintiff.
>
> D. Improperly inspected the dryers, hoses and hose clamps of the plaintiff.
>
> E. Failed to warn the plaintiff that its dryers, hoses and hose clamps would be subjected to pulsating and erratic pressure by reason of the bypass around the service regulators.
>
> The defendant denies that it was negligent in doing any of the things claimed by the plaintiff; denies that any claimed act or omission on the part of the defendant was a proximate cause of the claimed damage and denies that the plaintiff was in the exercise of ordinary care."

The trial court did give plaintiff's instruction No. 16, which was very similar to instruction No. 14, but did not refer to improper inspection.

In the trial court Northern had objected to subpara-

graph (D) of instruction No. 14 on the ground that the law imposes no duty on a gas company to inspect and maintain a customer's equipment. The appellate court held that, in determining the correctness of the trial court's refusal of instruction No. 14, it would consider only the objection which had been advanced by the defendant. We do not agree. If a ruling was correct, on any ground, it stands even though it was based upon an incorrect reason. See, *e.g., Keck v. Keck* (1974), 56 Ill.2d 508, 514; *Monarski v. Greb* (1950), 407 Ill. 281; *Sweeney v. Matthews* (1968), 94 Ill. App. 2d 6, *aff'd* (1970), 46 Ill.2d 64.

Subparagraph (D) of instruction No. 14 required the court to instruct the jury that one of the issues was whether the defendant "[i]mproperly inspected the dryers, hoses and hose clamps of the plaintiff." It is settled "that where a gas company does not install the pipes or fixtures and does not own them and has no control over them it is not responsible for their condition or for their maintenance, and as a result is not liable for injuries caused by a leak therein of which it has no knowledge." (*Clare v. Bond County Gas Co.* (1934), 356 Ill. 241, 244.) Pioneer argues, however, that this statement of the law is inapplicable because the instruction did not charge Northern with a duty to inspect; rather, it charged that Northern had negligently conducted an inspection. It contends that under our decision in *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill.2d 69, a party may be liable for a negligently conducted inspection even though there was no duty to inspect. But an important factual issue in this case was whether or not there had been an inspection. O'Reilly and Bergeson testified that they had "looked at" one or two sets of dryers and hoses, but they consistently denied that they had conducted an inspection of individual pieces of equipment. Instruction 14(D) could have been interpreted by the jury as stating that an inspection had been made and that plaintiff claimed it to have been improperly made. Whether any inspection had been made was a

vigorously disputed question. Because this equivocal instruction could be viewed as accepting as proved facts which were in dispute, it was properly refused. *O'Flaherty v. Mann* (1902), 196 Ill. 304, 307; *West Chicago Street R.R. Co. v. Estep* (1896), 162 Ill. 130, 132; 34 Ill. L. & Pr. *Trial* sec. 153 (1958).

A second contention of the plaintiff concerns the refusal of its instruction No. 15, which stated:

> "Gas is a dangerous commodity and a party which undertakes to furnish such service must exercise a degree of care commensurate to the danger which it is its duty to avoid and must use every reasonable precaution in guarding against injury to the person or property of others."

This language was taken from our opinion in *Metz v. Central Illinois Electric and Gas Co.* (1965), 32 Ill.2d 446.

The trial court did give Illinois Pattern Jury Instructions (IPI Civil) 10.02 and 10.04. These instructions stated that it was the duty of the defendant to use ordinary care for the safety of the plaintiff's property and that ordinary care meant "the care a reasonably careful person would use under circumstances similar to those shown by the evidence."

We agree with the appellate court that the trial court properly exercised its discretion when it refused instruction No. 15. That instruction could have confused the jury because it implied that the party "which undertakes to furnish such service" is the only party charged with the responsibility to exercise a degree of care commensurate to the danger. The instructions that were given properly informed the jury of the standard of care the defendant owed the plaintiff.

In addition to its contentions arising from the refusal of instructions, Pioneer urges that the trial court erred in striking count III of the complaint. That count, together with counts IV and V, was stricken on defendant's motion at the close of all the evidence. Pioneer appealed only as to count III, and the appellate court reversed, holding that

count III stated a cause of action which should have been submitted to the jury. Count III alleged:

"3. That the defendant impliedly warranted to the plaintiff in the aforesaid transactions that the meters, regulators, service lines and related equipment owned, operated and maintained by defendant for the supply of gas would be fit for the purpose for which they were utilized, the transmission of gas purchased by plaintiff from defendant, and that said equipment was of merchantable quality, and defendant knew, or should have known, that plaintiff would rely upon said warranties and use said regulators, meters, service lines and related equipment for the purpose for which they were intended.

4. In purchasing and using gas supplied by defendant through defendant's meters, regulators, service lines and related equipment, plaintiff did, in fact, rely upon said warranties as well as upon defendant's skill and judgment to design, develop, manufacture, assemble, install and maintain a suitable gas supply system.

5. That the defendant by its duly authorized agents, servants or employees, installed a by-pass of one of the regulators installed in said system and that the by-pass of a regulator permitted wide fluctuation in gas pressure and excessive gas pressure in the system constituted a breach of the aforesaid warranty by defendant and resulted in plaintiff's loss and damage hereinafter described."

We believe that the trial court properly struck count III. That count alleged that Northern warranted the fitness of its own equipment knowing that the plaintiff would rely upon the warranties "and use the equipment for the purpose for which it was intended." The language seems to have been intended to charge warranties of merchantability and of fitness for a particular purpose under the Uniform Commercial Code. Under the Code, however, implied warranties extend only to goods sold to a buyer (Ill. Rev. Stat. 1973, ch. 26, pars. 2—102, 2—105). The defendant's meters and service lines were not sold to the plaintiff. What was sold was the gas, and it would be the gas, and not the defendant's equipment that would be

covered by the provisions of the Uniform Commercial Code.

Count III does not allege a breach of warranty with respect to the gas sold to the plaintiff by the defendant. We have no occasion, therefore, to consider whether and to what extent the provisions of the Uniform Commercial Code may be applicable to the continuous distribution of gas through a system of pipelines and mains by a public utility, as distinguished, for example, from discrete sales of bottled gas.

The final question to be determined is whether the trial court properly sustained the defendant's objection to a question which the plaintiff asked its expert witness, Edward McLean, on redirect examination. On direct examination the plaintiff had asked McLean a series of questions regarding the applicability of the American Standard Code for Pressure Piping (published by the American Society of Mechanical Engineers) to the situation which existed between Pioneer and Northern. On cross-examination, the defendant asked McLean about the application of various sections of the Code to Pioneer's facilities, and whether they provided for the inspection of any Pioneer equipment, property, or facilities. On redirect, the plaintiff asked the following question:

"The question was posed to you, by this particular provision, [section 845.41] is Northern Illinois Gas Company required to inspect Pioneer property, equipment and facilities, and you answered no.

Tell us, what does that section provide and in what way does it relate to Pioneer and the facilities that have been testified to?"

The defendant's objection to this question was sustained. In its brief the plaintiff argues that the witness should have been permitted to answer, saying:

"Although the code provisions specifically apply to the defendant's property rather than plaintiff's, a violation of those provisions breaches a duty owed plaintiff because plaintiff's property is directly affected."

It is not clear whether the plaintiff was asking the witness to testify regarding a matter of law or of fact. The defendant objected upon the ground that the question exceeded the scope of the cross-examination. The trial judge sustained the objection, however, upon the ground that "we don't need this witness to tell us what is contained therein." An offer of proof might have removed the ambiguity, but none was made and consequently the ruling was not properly preserved for review. See *Grosh v. Acom* (1927), 325 Ill. 474, 490; *McMahon v. Coronet Insurance Co.* (1972), 6 Ill. App. 3d 704, 711; Cleary, Handbook of Illinois Evidence sec. 7.7 (2d ed. 1963).

For the reasons stated, the judgment of the appellate court is reversed, and the judgment of the circuit court of Bureau County is affirmed.

*Appellate court reversed; circuit court affirmed.*

MR. JUSTICE RYAN took no part in the consideration or decision of this case.