**FEDERAL DEPOSIT INSURANCE CORPORATION, a federal corporation, Plaintiff,**

v.

**W.R. GRACE & COMPANY, et al., Defendants.**

**No. 84 C 5031.**

United States District Court, N.D. Illinois, E.D.

June 6, 1988.

---

Jay Erens, Paul K. Vickrey, William E. Rattner, Erens, Hallock & Miller, William E. Rattner, Paul K. Vickrey, Thomas M. Dethlefs, Hopkins & Sutter, Chicago, Ill., for plaintiff.

W. Donald McSweeney, Allan Horwich, Ann Rae Heitland, Schiff Hardin & Waite, Gary L. Prior, McDermott Will & Emery, Chicago, Ill., Denis McInerney, Charles A. Gilman, Jerome Sheinman, Cahill, Gordon & Reindel, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

LEINENWEBER, District Judge.

On October 20, 1987 the jury returned a verdict in favor of plaintiff, Federal Deposit Insurance Corporation ("FDIC"), and against defendants, W.R. Grace & Company, et al. (collectively referred to as "Grace"), setting compensatory damages in the sum of twenty-five million dollars and punitive damages in the sum of seventy-five million dollars. On the same date the court entered judgment in favor of the FDIC, which judgments were docketed on October 22, 1987. Grace has now filed a motion for a judgment notwithstanding the verdict ("JNOV") pursuant to Rule 50(b) and in the alternative a motion pursuant to Rule 59(a)(1), Fed.R.Civ.P., to set aside the verdict of the jury and the judgment entered thereon and to grant a new trial, or in the further alternative for remittitur.

## MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT STANDARD

Initially the parties dispute whether the Illinois standard or the federal standard for entertaining a JNOV applies. Defendant argues for an Illinois standard in a

case such as this which involves a state law fraud claim. The FDIC however claims that a federal standard governs the disposition of motions for JNOV in federal courts. Although neither party has discussed the difference between the Illinois standard and the federal standard, if any, it does appear that the Seventh Circuit has dictated the Illinois standard be used in diversity cases. *Ill. State Trust Co. v. Terminal R Assn. of St. Louis,* 440 F.2d 497, 500 (7th Cir.1971). Jurisdiction here is based on diversity at least in part. Therefore the court will apply the Illinois standard as enunciated in *Pedrick v. Peoria & Eastern RR,* 37 Ill.2d 494, 510, 229 N.E.2d 504, 513–514 (1967). This standard is:

> "in our judgment verdicts ought to be directed and judgments notwithstanding the verdict entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand."

Stated another way, the motion for a JNOV presents the question whether there is in the record any evidence which, standing alone and taken with all intendments most favorable to the party resisting the motion, tends to prove the material elements of the case. Only the evidence favorable to the plaintiff may be considered and if it makes out a *prima facie* case sufficient in itself for the jury the motion must be denied. 23 *ILP* "Judgments" § 152, 372. In ruling on a motion the court may not determine any controverted questions of fact or pass on the credibility of witnesses or consider any purported impeachment. Ruling on the admission and exclusion of evidence is outside the function of the motion as are considerations of jury instructions or other procedural aspects of the trial. *Id.,* pp. 368–369.

### MOTION FOR A NEW TRIAL STANDARD

Under Illinois law a new trial should be granted only where it appears that there has been a miscarriage of justice and that the granting of such relief will be in the interest of justice. New trials may be granted when the verdict returned by the jury appears to be the result of passion, prejudice, partiality or other improper motive and where errors and irregularities occurred during the course of the trial which might have affected the result. 28 *ILP* "New Trial" § 11, pp. 580–581. On a motion for a new trial, unlike the motion for a JNOV, the court must weigh the evidence and set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence. *Lynch v. Bd. of Ed. of Collinsville,* 82 Ill.2d 415, 45 Ill.Dec. 96, 103, 412 N.E.2d 447, 454 (1980); *Heideman v. Kelsey,* 414 Ill. 453, 466, 111 N.E.2d 538 (1953); *Mizowek v. DeFranco,* 64 Ill.2d 303, 1 Ill.Dec. 32, 356 N.E.2d 32 (1976). The inquiry is whether the result reached was one which is reasonable on the facts in evidence and not whether other conclusions might also have been reached. *Lynch,* 45 Ill.Dec. at p. 103, 412 N.E.2d at p. 454.

### THE ASSIGNMENT BY CONTINENTAL BANK ("BANK") TO THE FDIC

The first point relied upon by Grace is its contention that the FDIC failed to prove that the claim against Grace was assigned to it and that, even if it did prove the assignment, claims for punitive damages are not assignable (defendant's memorandum, p. 13). The FDIC responds that the point was waived by Grace's failure to raise it in its motion for a directed verdict or in its statement of contested issues in the joint pre-trial order. In addition the FDIC pointed out that Grace in its answer admitted the fact of the assignment while disputing the legal effect. (See Answer to Second Amended Complaint)

■ The legal effect of the assignment was raised and determined in pre-trial motions in this case in which Grace contended that the fraud claim was not assignable. On September 17, 1987 the court held that the fraud claim clearly was assignable to the FDIC. The court therefore finds that the fact of, as opposed to the legal effect of, the assignment was admitted by Grace. Accordingly, it was unnecessary for the

FDIC to prove the facts of the assignment at trial.

■ More difficult is the question of the assignability of the claim for punitive damages. The FDIC claims that the matter was waived by Grace's failure to include the point in its motion for a directed verdict. However the Seventh Circuit has held that a point that is purely legal, and not within the province of the jury, is not waived by failure to include it in the directed verdict motion. *Benson v. Allphin*, 786 F.2d 268, 274 (7th Cir.1986) *cert. denied*, 479 U.S. 848, 107 S.Ct. 172, 93 L.Ed.2d 109. Grace's main argument is that under Illinois law punitive damages may not be recovered by an assignee of a claim for fraud. Grace contends that the claim is assignable only if it would survive the death of the injured party and that claims for punitive damages will not survive the death of the injured party under Illinois law, citing *Mattyasovszky v. West Towns Bus Co.*, 61 Ill.2d 31, 330 N.E.2d 509 (1975), and cases following, such as *In re Air Crash Disaster near Chgo., Ill.*, 644 F.2d 594, 605–606 (7th Cir.) *cert. denied*, 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187 (1981). However *Mattyasovszky* and the other cases cited by defendant are causes of action for torts to the person which ordinarily are not assignable under Illinois law. On the other hand causes of action for torts to property ordinarily may be assigned, 3 *ILP* "Assignments" § 15, p. 439. Specifically actions for fraud or deceit survive by statute. Ill.Rev.Stat., ch. 110½, § 27–6. Accordingly, it has been held in Illinois that a cause of action for fraud or deceit is assignable. *Brown v. State Farm Mutual Auto Ins. Assn.*, 1 Ill.App.3d 47, 272 N.E.2d 261; *Browning v. Heritage Ins. Co.*, 33 Ill.App.3d 949, 338 N.E.2d 912. Further, Illinois follows the majority rule which holds that punitive damages are a type of relief which is part and parcel of the underlying cause of ac-

tion and do not constitute an independent basis of recovery. Ghiardi & Kircher, *Punitive Damages Law & Practice* § 66.16, p. 67. Therefore the case cited by both parties, *1st Fed. Savings & Loan v. Oppenheim*, 629 F.Supp. 427 (S.D.N.Y.1986) at pp. 446–447, which involved the Federal Savings and Loan Insurance Corporation, a similar agency to the FDIC, is directly on point:

> "New York permits the assignment of essentially all tort claims other than those involving recovery for personal injury (citation omitted). Once a cause of action is determined to be assignable, a punitive damage claim based upon the cause of action may also be brought by the assignee (citation omitted)."

Accordingly, the court again finds that the punitive damage claim was properly assigned to the FDIC.

## WHETHER THE BANK WAS IRREVOCABLY BOUND TO MAKE THE LOAN BEFORE THE ALLEGED FRAUD

Grace's primary argument for a JNOV is its contention that Continental had issued a binding loan commitment prior to the time that Grace had learned about the "bad news."[1] The FDIC's position is that the loan commitment by its very terms was "subject to satisfactory final loan documentation" and thus was not binding.

■ Conditions in a contract may be precedent or subsequent depending upon the intent of the parties. 12A, *ILP* "Contracts" § 321, p. 166. A determination of the intent of the parties to a contract may be a question of law or a question of fact depending upon the documents presented. *Interway, Inc. v. Alagna*, 85 Ill.App.3d 1094, 41 Ill.Dec. 117, 407 N.E.2d 615. As in *Alagna* the resolution of the issue depends upon the characterization of the "subject to" language in the letter. If the

---

1. "Bad news", coined by plaintiff for use in this case, has been adopted for use in this opinion. It refers to the discovery by Centex that the main producing zone in the Southwest Piney Woods field had a serious water level problem that made the likelihood of gas reserves in the field very low. In effect the field was "dry." This bad news was learned by a Grace employee on May 8, 1980. The initial loan "commitment" letter was given by the bank to Grace on March 14, 1980. It was amended on two subsequent occasions: April 1, 1980 and April 7, 1980.

language is ambiguous the determination of its meaning is a question of fact for the jury but if it is unambiguous its meaning is a question of law for the court. *Id.* at 121. When used in connection with contracts "subject to" usually indicates a condition for a party's duty of performance and suggests that mere negotiation was contemplated. *Id.* at 121. As stated in 17 Am. Jur.2d Contract, § 320 at 749:

> "Proviso in a contract creates a condition, in the absence of anything in the contract to show that such was not the intention of the parties, and the employment of such words as 'when', 'after', 'as soon as', or 'subject to' usually indicate that a promise is not to be performed except upon a condition ..."

█ It would appear therefore that the best that could be said in behalf of Grace is that the commitment letter was ambiguous and the intent as to whether the commitment letter was binding as of March 14, 1980, or as amended subsequently on April 1, 1980 and again on April 7, 1980, was a question of fact that was properly left to the jury to decide. The jury was instructed by the court that "the borrower's duty to disclose ceases when a bank is obligated to lend the money." The jury obviously decided that the parties did not intend to enter into a binding commitment prior to the time that Grace learned of the bad news.

Grace also complains that the court erroneously failed to instruct the jury on the method to determine when the loan commitment was binding. However of the instructions numbered 16 through 20 submitted by Grace, the first four were preemptory as to a binding date which was a disputed fact and the last was confusing as well as preemptory. In Illinois an instruction must not assume the existence of a disputed fact. *Pioneer Hi–Bred Corn Co. v. Northern Ill. Gas Co.*, 61 Ill.2d 6, 329 N.E.2d 228, 232 (1975). In any event the instructions taken as a whole adequately covered the issue.

## BURDEN OF PROOF INSTRUCTION

█ Grace next argues that the court's definition of the burden of proof by clear and convincing evidence as that which "leaves the mind well satisfied that the fact alleged is true" was erroneous because it inadequately conveyed the stricter standard to distinguish it from the "preponderance of the evidence" standard. Grace also argues that the court's definition was so vague and ambiguous so as to give the jury no parameters with which to judge the evidence.

Grace submitted two alternative instructions which defined clear and convincing evidence as "proof that leaves no reasonable doubt in the mind of the trier of fact" or, alternatively, that which is "highly probably true." However the clear and convincing evidence is a standard of proof below the criminal standard of "beyond a reasonable doubt." *Barrington Press, Inc. v. Morey*, 752 F.2d 307, 310 (7th Cir. 1985). Grace's first instruction confusingly sounds like the more rigorous criminal standard and was properly refused. The alternative of "highly probably true" is bad English and refusal was well within the court's discretion. The court finds that the burden of proof instruction was proper.

## RELIANCE

█ Grace next argues that the FDIC failed to prove either that the bank actually relied or that it had a right to rely on the alleged misrepresentations which is an essential element of fraud, citing *Soules v. GMC*, 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 402 N.E.2d 599 (1980). Grace's argument stems both from its contentions that the bank was committed to make the loan before Grace knew the bad news and that the bank actually knew or should have known the bad news before making the loan. Each party in its brief analyzed the facts on this point in considerable depth. Suffice to say that the issue turned to a considerable extent on the veracity of the witnesses produced by the FDIC, including Farrell and Cordell, all of whom denied knowing anything about the bad news prior to the loan closing. The court finds that there was sufficient evidence admitted to support the jury's finding of reliance on the part of the bank.

■ Grace next contends that the court failed to instruct the jury properly on the elements of reliance.

In this case the court instructed the jury that:

"Continental Bank must have relied on Grace's silence and to have had a right to do so and such reliance must have been reasonable under the circumstances."

This correctly stated the law. *Redarowicz v. Ohlendorf,* 92 Ill.2d 171, 185–86, 65 Ill. Dec. 411, 441 N.E.2d 324 (1982); *Chgo. Title & Trust Co. v. 1st Arlington Natl. Bank,* 118 Ill.App.3d 401, 409, 73 Ill.Dec. 626, 454 N.E.2d 723 (1st Dist.1983). Grace specifically argues that the court should have instructed the jury that after issuing a binding loan commitment the bank could not thereafter claim to rely on any alleged omission (defendant's instruction No. 13) and that actual knowledge of the omitted facts absolutely precludes a claim for fraud. The instructions tendered by Grace were duplicative and in some respects argumentative. It is not necessary that a court include all of the arguments that the parties may wish to make in the charge to the jury. It is the duty of the parties to argue the case while it is the duty of the court to state the law in a simple non-argumentative manner. The instruction was proper under the circumstances in this case and the refusal to give Grace's tendered instructions does not require a new trial.

## MISCELLANEOUS

■ Next Grace argues that the court improperly excluded certain documents which dealt with the relationship between Continental Bank and Mid–America Oil & Gas Company ("Mid–America"), a subsidiary of Centex Corporation ("Centex"). However the court allowed Grace's counsel to cross-examine bank witnesses at great length about the exhibits and the relationship between Continental and Mid–America. The exhibits had little relevance and the denial of admission was not prejudicial.

■ Grace also complains about the exclusion of defendant's exhibit number 183. Exhibit number 183 was a hypothetical projection prepared by Grace for trial which showed what would have been recovered on the loan if assumptions of the bank's engineers had turned out to be true. This exhibit was used for demonstrative purposes, was part of Grace's argument and therefore not evidence in the case and was properly excluded.

■ Grace next complains about the court preventing it from reading from depositions in its case that had already been read previously in the plaintiff's case. Rule 611 of the Fed.R.Ev. gives the court the right to exercise reasonable control over the mode and order of interrogating witnesses and the presentation of evidence to avoid needless consumption of time. The court feels that its handling of the deposition testimony was well within its discretion.

Grace complains of several other matters in addition to the foregoing, none of which was of such character that its inclusion or exclusion would have affected the result. *Lynch,* 45 Ill.Dec. at 96, 412 N.E.2d at 454.

## SCIENTER

■ Grace next argues that there was no proof that it acted with scienter. Both parties again provided extensive analysis of the testimony and evidence on this issue. A great number of Grace employees and officers testified in person and by deposition. The jury saw the witnesses and heard the testimony. The decision on this issue in large part hinged on the observations of the jury and therefore its finding ought not to be disturbed.

■ Grace next argues that the court failed to give the jury any definition of intent or scienter. However the court instructed the jury that to establish fraud by omission the FDIC had to prove that "Grace must have failed to disclose the fact with the intent to deceive." Grace instead wanted the court to define scienter by exclusion which is not only unnecessary but leads to overly long and confusing instructions. The court's instruction was adequate.

■ Grace next argues that the court excluded evidence of current Grace and

bank business relations which it claims would show an inconsistency with the bank claims at trial. However the offer of proof made by Grace did not disclose that the parties had been involved in any other production payment loans similar to the loan involved in this lawsuit. The introduction into evidence of the subsequent complicated business dealings between Grace and the bank would have sidetracked the trial into an examination and explanation of each dealing. This would have caused undue delay and confusion making the evidence properly excludable under Rule 403, Fed.R.Ev.

■ Defendant next contends that the court erred in submitting to the jury the issue of whether Grace had a duty to speak prior to the loan closing. Grace makes a two-fold argument: first, that an unconditional binding commitment eliminated the duty to speak at all, and second, the bank's failure to include a material adverse change provision in the commitment letter also eliminated the duty to speak. The former was dealt with earlier in this opinion and with respect to the latter testimony was given by both bank and Grace employees that it was clearly understood that custom required disclosure of material adverse changes regardless of the presence of a material change provision in the commitment. Therefore the duty to speak was properly submitted to the jury.

■ Grace next argues that the court erred in instructing on the issue of the duty to speak because the instruction included a statement that prior representations also give rise to a duty to speak. However evidence was introduced that Grace had provided the bank with reports and economic analysis prior to the issuance of the commitment letters which was adequate to support the existence of the type of prior representations that would form a basis for creating a subsequent duty to speak. *McGrath v. Zenith Radio Corp.*, 651 F.2d 458, 468 (7th Cir.1981) *cert. denied* 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114.

■ Next Grace argues that the court's instruction on what constitutes a material fact was prejudicial error. The court instructed the jury that a fact is material if it "relates to a matter upon which the bank could be expected to have acted differently had it known the fact." Grace has a two-fold criticism: first, the instruction denigrated the significance of the fact itself by only requiring that it be related to "a matter," and second, it used the "lesser" standard "could be expected" instead of the "stricter" standard "would have" that was proposed by Grace. The instruction given by the court finds recent support in both the Seventh Circuit and the First District Appellate Court in *Barrington Press, Inc. v. Morey*, 752 F.2d 307, 310 (7th Cir.1985), and *Mother Earth, Ltd. v. Strawberry Camel, Ltd.*, 72 Ill.App.3d 37, 28 Ill.Dec. 226, 390 N.E.2d 393 (1st Dist.1979). Assuming there is a difference between the two instructions, the court finds that the result of the trial did not hinge on the formulation of materiality and therefore any error was not prejudicial.

### WAIVER

■ Grace next argues that the court erred in refusing to instruct the jury on the issue of whether the bank waived its claim for fraud. The FDIC contends that Grace failed to preserve this defense because it was not included in the pre-trial order. Grace states that the defense was preserved through the general language "latches and other equitable principles" in the pre-trial order. However the court finds that Grace did not submit evidence justifying any instruction on waiver. The rationale of the defense of waiver is that continued performance of a contract by a party after learning of the existence of fraud makes any subsequent injury self-inflicted because such injury could have been avoided by disaffirmation or rescission. *Havoco America, Ltd. v. Hilco, Inc.*, 731 F.2d 1282, 1287 (7th Cir.1984). Here the bank loaned Grace seventy-five million dollars in 1980. Continued performance consisted mainly of accepting payments of principal and interest up to and including the time of trial. Through no stretch of the imagination can such conduct be deemed to have been injurious to the bank.

Cases cited by defendant are inapposite. Therefore the instruction was properly refused.

## DAMAGES

■ Grace argues that the FDIC failed to prove that the bank suffered any damage from defendant's conduct and that the court's instruction on damages was error. Grace first claims that the bank did not rely on any production from Southwest Piney Woods in making its loan and consequently the "bad news" was irrelevant. However the record is replete with testimony by bank employees that a non-recourse loan requires ultraconservative analysis, field diversification, and "comfort level" to protect the bank from the very problems that beset it as a result of this loan. The jury heard the witnesses and arguments of counsel in discussing the testimony of the witnesses. There was ample evidence to support the jury's finding that the bank either would not have made the loan at all or would have made the laon in a substantially reduced amount had Grace not included the Southwest Piney Woods in the loan package.

■ The court instructed the jury as follows:

"If you decide to award compensatory damages, then you shall award such amount of money as will reasonably and fairly compensate the plaintiff for its damages proved by the evidence to have resulted from the fraud committed by Grace. Such amounts shall be credited to the outstanding balance of the loan."

Authority for Grace's position is *Martin v. All State Ins. Co.,* 92 Ill.App.3d 829, 835, 48 Ill.Dec. 316, 416 N.E.2d 347 (1981). In that case the appellate court gave an instruction similar to the one given in this case to the extent that each embodied Illinois Pattern Instruction (I.P.I.) 30.01. However in addition the court in *Martin* added elements of damages, I.P.I. 30.02, 30.05, and 30.06. The defendants successfully argued that the specific elements, viz., pain and suffering, reasonable expense of medical care, and nature, extent and duration of the injury, could not have

resulted from defendant's fraud which was misrepresenting the scope of an automobile insurance policy. Here the court's instruction specifically limited recoverable damages to those resulting from any fraud committed by Grace. *Martin* is not therefore applicable.

Defendant's final objection to this instruction is that it discloses the fact that any award of compensatory damages is to be credited to the outstanding balance of Grace's loan. Defendant does not dispute that the instruction accurately states the law; it objects only to telling the jury of the consequences of its verdict. No authority is cited in support of the objection nor is any argument made about any prejudice resulting. Accordingly, the court finds no error in giving the damage instruction.

■ Lastly, Grace argues that the twenty-five million dollar compensatory damage award was contrary to the evidence. The law requires that there be a rational connection between the evidence on damages and the verdict. *Abernathy v. Superior Hardwoods, Inc.,* 704 F.2d 963, 971 (7th Cir.1983). In reviewing the evidence on this point the court notes that Grace sought compensatory damages of twenty-six million two hundred thousand dollars for itself from Centex as a result of the failure of the Southwest Piney Woods field (the bad news). There was some testimony that the properties were only capable of supporting a fifty million dollar loan. The payment history of the loan in question showed that a twenty-five million dollar payment on principal at this time might allow the loan to be repaid through future production revenues. In any event the court finds that there was sufficient evidence in the record to justify the jury's verdict.

## PUNITIVE DAMAGES

Grace makes a multi-faceted attack on the seventy-five million dollar punitive damage award.

Grace first argues a matter that has been previously dealt with that an assignee cannot be awarded punitive damages.

■ Next Grace argues that the issue of punitive damages should not have been submitted to the jury. However in Illinois punitive damages are properly recoverable in a fraud action "where the false representations are wantonly and designedly made." *Laughlin v. Hopkinson*, 292 Ill. 80, 126 N.E. 591 (1920); *Home Savings & Loan Assn. of Joliet v. Schneider*, 108 Ill.2d 277, 91 Ill.Dec. 590, 593, 483 N.E.2d 1225, 1228 (1985). The threshhold issue is one of law: whether there is sufficient evidence justifying the submission. The question is whether there is some evidence of wilful and wantonness on the part of Grace upon which the jury could base its decision. If so then it was proper to submit the issue to the jury. The court determined at trial that this threshhold had been met. The evidence justifying the submission included evidence that Grace considered itself entitled to punitive damages from Centex for essentially the same conduct with which the FDIC charges Grace, i.e., failure to disclose to Grace the serious water problem in the Southwest Piney Woods. The court continues to believe that the issue of punitive damages was properly submitted to the jury.

Grace also argues that the court erroneously instructed the jury on the issue of punitive damages.

■ The court gave a modified version of I.P.I. 35.01 requiring that the jury find "Grace ... guilty not only of fraud but also of wilful and wanton conduct in addition to fraud which proximately caused injury to the plaintiff ..." before it could award punitive damages to the FDIC. Grace claims that the instruction permitted the jury to award punitive damages if it found that Grace committed "some wilful and wanton conduct in addition to fraud"

regardless of whether it was related to the fraud. However the instruction clearly states that the wilful and wanton conduct as well as the fraud must be proximately related to the injury to the bank.

Grace also argues that the court erred in giving the instruction derived from I.P.I. 14.01 defining wilful and wanton conduct. Defendant claims without citing any authority that this instruction is not applicable in a fraud action. However Illinois Supreme Court Rule 239 (Ill.Rev.Stat., ch. 110A, § 239) requires the use of an I.P.I. instruction when it is applicable in a civil case, "giving due consideration of the facts and the prevailing law." Defendant has strenuously argued that Illinois law is applicable in the state fraud claim. Accordingly, the court finds that the instruction was proper.

## CONSTITUTIONALITY OF PUNITIVE DAMAGES

Lastly Grace argues that the seventy-five million dollar punitive damage award was so excessive as to be unconstitutional and amounts to a miscarriage of justice, and requires a remittitur.

The issues of constitutionality of punitive damages [2] has received much recent attention due to the increasing size and frequency of such awards and due to the pendency before the Supreme Court of *Bankers Life & Casualty Co. v. Crenshaw*, 48 C.C.H.S. Ct.Bull., p. B1948. However the hopes of receiving some guidance were dashed when the court refused to reach the issue of whether a particularly high punitive damage award ($1.6 million punitive damage award compared to a $20,000 compensatory damage award) violated the Due Process and Excessive Fines Clauses of the Constitution.[3]

Punitive or exemplary awards had their origin in the Seventeenth and Eighteenth

---

**2.** It is generally contended that the Supreme Court gave constitutional approval to punitive damages in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1969). However defendant there conceded that the Constitution did not bar punitive damages in

civil cases and made its argument on First Amendment grounds instead.

**3.** On May 31, 1988 the Supreme Court declined without opinion to review eight cases in which juries awarded punitive damages against business defendants.

Century when English juries began awarding large amounts of damages in certain types of cases that were unrelated to any tangible loss. These cases fell into a wide variety of legal categories but had one common attribute: they each involved acts that resulted in affronts to the honor of innocent victims and tended to provoke communal outrage. The punitive and deterrent aspects as justification for damage awards in excess of tangible harm first received judicial expression in *Wilkes v. Wood*, 98 Eng.Rep. 489 (C.P.1763).[4]

Thus damage awards had taken on a dual nature: compensation for the wrong and punishment for the defendant. This duel nature early was recognized in American courts, e.g., *McNamara v. King*, 7 Ill. (2 Gilm.) 432, 437 (1895) ("The function of punitive damages is not only to compensate the plaintiff, but to punish the defendant").

Gradually as the concept of actual harm was broadened to include intangible harm, the original compensatory function of punitive damages was fulfilled through compensatory damages. Courts began increasingly to emphasize the penal aspect. Today most courts speak exclusively in terms of punishment and deterrence, e.g., *Restatement (Second) of Torts*, § 908; *Mattyasovszky v. West Town Bus Co.*, 61 Ill.2d 32, 330 N.E.2d 509, 511; *Hazelwood*, 71 Ill.Dec. at 327, 450 N.E.2d at 1206.

The doctrine of exemplary or punitive damages today is subject to intense criticism on both constitutional (e.g., Wheeler, "The Constitutional Case for Reforming Punitive Damages," 69 *Va.L.Rev.* 269) and economic grounds (e.g., Ellis, "Fairness and Efficiency in the Law of Punitive Damages," 56 *So.Calif.Rev.I*, 55 (1982)). In the context of separation of powers we need concern ourselves only with the former; the legislative "inattention" that allows an "inefficient" system to continue is not subject to judicial interference. Cf. C. Britell, "The Lawmakers," 65 *Colum.L.Rev.* 749 (1965).

The constitutional attack usually centers around the Eighth Amendment excessive fine clause and Fourteenth Amendment due process clause. The latter however seems to be the main cannon in the arsenal of those arguing unconstitutionality and for good reason. The Eighth Amendment has generally been considered to be applicable only to criminal proceedings (*Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)) and not applicable to civil penalties. For example, statutory multiple damages (e.g., RICO, Clayton Act, etc.), (*Lindsey v. Normet*, 405 U.S. 56, 78, 92 S.Ct. 862, 876–877, 31 L.Ed. 2d 36 (1972); *Rex Trailer Co. v. U.S.*, 350 U.S. 148, 151–152, 76 S.Ct. 219, 221–222, 100 L.Ed. 149 (1955)), fixed and variable fines (e.g., IRS Code, OSHA, etc.); (*Helvering v. Mitchell*, 303 U.S. 391, 400–403, 58 S.Ct. 630, 633–635, 82 L.Ed. 917 (1938); *Frank Irey, Jr., Inc. v. O.S.H. Review Bd.*, 519 F.2d 1200, 1203–1204 (3rd Cir.1975) *aff'd* on other grounds sub nom; *Atlas Roofing v. O.S.H. Review Bd.*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977); *U.S. v. J.B. Williams Co.*, 498 F.2d 414, 421 (2nd Cir.1974)); and civil forfeitures (e.g., RICO, smuggling, Tariff Act, etc.); (*One Lot Emerald Cut Stones & One Ring v. U.S.*, 409 U.S. 232, 235–237, 93 S.Ct. 489, 492–493, 34 L.Ed.2d 438 (1972); *Helvering*, 303 U.S. at p. 400, 58 S.Ct. at p. 633), have all been recognized as enforceable in civil proceedings in spite of their comparative severity and not been subject to the procedural rules governing criminal prosecutions. The imposition of punitive damages to deter conduct cannot by any stretch of the imagination be considered to be of greater severity than the above civil procedures. Accordingly, the court finds that the Eighth Amendment excessive fine clause inapplicable to the imposition of punitive damages in a civil fraud suit.

The Fourteenth Amendment however has received considerable support in the literature for supporting the unconstitutionality of the usual procedure (that was utilized

---

**4.** For an interesting historical discussion, see Ellis, "Fairness and Efficiency and the Law of Punitive Damages," 56 *So.Calif.L.Rev.* 55 (1982).

here) for the assessment of punitive damages, e.g., Wheeler, 69 *Va.L.Rev.* 269.

Generally the Fourteenth Amendment attack starts with the premise that the due process clause requires that legal procedures be consistent with fundamental fairness. *Lassiter v. Dept. of Social Services*, 452 U.S. 18, 24–25, 101 S.Ct. 2153, 2158–2159, 68 L.Ed.2d 640 (1981). The attack on the punitive damage procedure focuses on the alleged vagueness of standards and terms and the virtual unlimited jury discretion to award or not to award punitive damages and to establish the amount. We shall examine each of these contentions in turn.

## VAGUENESS AND LACK OF STANDARDS

In this case the court instructed the jury that it could only return punitive damages if (1) defendant was guilty of fraud, (2) defendant was guilty of wilful and wanton conduct in addition to fraud, (3) both of which proximately caused injury to plaintiff, and (4) justice and the public good require the assessment of such damages. The jury was further instructed that, if so, they should select an amount which will serve to punish defendant and deter others from the commission of like offenses. The court further instructed the jury that wilful and wanton conduct was defined as:

"A course of action which shows actual or deliberate intention to harm or which, if not intentional, shows an utter indifference or conscious disregard for the rights of the others."

It cannot be seriously argued that these instructions, as far as telling the jury when the conduct of a defendant qualifies for the imposition of punitive damages, are unconstitutionally vague. Wilful and wanton conduct in Illinois has long been a benchmark for the imposition of liability. For example, the duty owed up until 1972 by an owner or driver of a motor vehicle to a guest passenger was not to injure him wilfully or wantonly and continues to this day

to be the duty owed a hitchhiker. Ill.Rev. Stat., ch. 95½, § 10–201. The duty owed up until 1984 by an owner or occupier of real estate to a licensee or social guest was not to injure him wilfully or wantonly and continues to this day to be the duty owed a trespasser. Ill.Rev.Stat., ch. 80, § 303; *Krantz v. Nichols*, 11 Ill.App.3d 37, 135 N.E.2d 816 (4th Dist.1956).

## JURY DISCRETION

A more difficult question of course is raised by the claim that the procedure in use in Illinois and most other states (and used in this case) fails to instruct the jury as to any standard to use in deciding a specific dollar amount to award for punitive damages. Thus a jury can in an individual case return a verdict awarding no punitive damages or, as it did in this case, award seventy-five million dollars. However it is incorrect to say that a jury has unbridled discretion to establish the size of the punitive damage award. First, the jury is instructed that it should set the award in an amount "which will serve to punish the defendant and to deter others from the commission of like offenses." Thus the jury is instructed that its verdict should be, in effect, large enough to serve as a punishment and as a deterrence. Consequently the jury is to consider the station, wealth, and activities of the defendant and of others in a position to commit similar offenses. The jury does not do this in a vacuum, it has the arguments of counsel on both sides to assist it in making these determinations. Thus a jury would know that a sizeable amount would be necessary in a case involving a defendant of the size of Grace, while on the other hand it would know that a much smaller verdict would be necessary to punish a blue collar worker.

*Post facto* review exercised by both the trial court and the appellate court, with the tool of the remittitur to reduce excessive amounts, is another limiting factor on jury discretion.[5] It is likewise improper to say that the *de facto* review authority of the

---

5. The only truly "unbridled" discretion that the jury has is to decide not to award punitive damages. Such a decision is not reviewable.

trial and appellate court is in itself unlimited. A large body of common law has developed and is developing through the reported case law and on computer research whereby meaningful standards of comparison are being created. Reviewing punitive damage awards under the special facts and circumstances of each case is really very little different than reviewing compensatory damage awards for intangible injuries. Who is to say what the proper recovery ought to be for loss of an arm, a weak lower back, or any of the myriad injuries that result from torts whether based on negligence, intentional conduct, or product defects.[6]

■■■ The purpose of the jury is to achieve a community consensus on a specific set of facts. The court purposely gives the jury vague instructions, e.g, wilful and wanton misconduct, negligence, reasonable man standard, beyond a reasonable doubt, pain and suffering, etc. Its unanimous verdict tells us what the community thinks the result should be. Occasionally, since like everything else the jury system is not perfect, an aberration occurs. There is adequate procedure currently in place to deal with such aberrations: a JNOV or a new trial. When the aberration is a verdict in an amount that shocks the judicial conscience, an additional tool has been developed: a remittitur in lieu of a new trial.

The system for punishing defendants who commit torts in a wilful and wanton manner has served us for over two hundred years, has been adopted for use in at least forty-six of the fifty states, and has not been subjected to constitutional attack until this year. No reason to date has been put forth of why a system that has been around such a long time is suddenly so fundamentally unfair so as to deny due process. Therefore the court finds no constitutional infirmity as to the procedure for assessment of punitive damages in this case.

## AMOUNT OF PUNITIVE DAMAGES

Since we have decided the constitutional question against Grace we must now turn to the amount of punitive damages assessed in this case and perform a *post facto* review to determine whether that amount is so excessive that the judicial conscience is shocked. The general accepted rule is that a trial court give great deference to the jury award and it is not to be lightly disturbed. Only in extreme cases should a trial or an appellate court interfere with the jury's determination. Ghiardi & Kircher, *Punitive Damages Law & Practice* § 18.04.

In Illinois the standard for reviewing an award is that a reduction must be made "when it is clearly excessive." *Smith v. Seiber*, 127 Ill.App.3d 950, 957, 82 Ill.Dec. 697, 469 N.E.2d 231 (1984); *Robeson v. Lescrenier*, 721 F.2d 1101, 1112–1114 (7th Cir.1983); and *Hazelwood v. Ill. Central Gulf RR*, 114 Ill.App.3d 703, 71 Ill.Dec. 320, 450 N.E.2d 1199 (4th Dist.1983).

■■■ The appropriate mechanism for reducing an award of punitive damages is to establish a proper award and extend to plaintiff the choice of accepting the remittitur or having a new trial on damages. *McKinnon v. City of Berwyn*, 750 F.2d 1383 (7th Cir.1984). *Hazelwood* lists three factors for a court to consider in determining whether a punitive damage award is excessive. The first factor is the nature and enormity of the wrong (i.e., "the punishment should fit the crime";[7] the second factor is the financial status of the defendant; and the third factor is the potential liability of the defendant beyond the present litigation. The third factor applies to multiple tort cases with multiple potential plaintiffs and is not relevant here. We

---

**6.** In Illinois the test of whether a jury verdict for compensatory damages is excessive is whether the total amount of the verdict falls within the necessary flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience. *Chapman v. Foggy*, 59 Ill. App.3d 552, 16 Ill.Dec. 758, 764, 375 N.E.2d 865, 871 (5th Dist. 1978); *King v. City of Chgo.*, 66 Ill.App.3d 356, 23 Ill.Dec. 386, 389, 384 N.E.2d 22, 25 (1st Dist. 1978).

**7.** "My object all sublime—
I shall achieve in time—
to let the punishment fit the crime ...,"
Gilbert, Mikado.

shall therefore look to the first two factors. It is obvious that deterrence would not be achieved if the wealth of the defendant allowed it to absorb the award with little or no discomfort. *Hatrock v. Edw. D. Jones & Co.,* 750 F.2d 767, 772 (9th Cir.1984) Where the wealth of the defendant is large, a large punitive damage award could well be appropriate. In the instant case at the time of judgment the jury's punitive damage award amounted to only 5.4 percent of Grace's $1.4 billion net worth and Grace is presently capable of paying the judgment.[8] Therefore the financial status of the defendant does not require a remittitur.

■ The court now turns to the remaining factor: the nature and enormity of the wrong. As stated in *Hazelwood,* while all acts which give rise to punitive damages are wilful and wanton, some acts are clearly more reprehensible than others and the egregiousness of the act should be reflected in the size of the award. Using this standard the award of seventy-five million dollars in punitive damages is clearly excessive and goes far beyond a fit punishment for the actions of Grace which gave rise to liability in this case. When all is said and done this case involved the purchase of gas fields by Grace with money borrowed from the bank without recourse, a risky endeavor. For a variety of reasons, including the plummeting of gas prices as interest rates soared, less than expected production from the proven gas reserves (the Thomasville wells), as well as non-productivity of the Southwest Piney Woods gas field, the loan has not been paid off as expected. Out of prudence and caution and undoubtedly because of the possibility of the events that did occur, the bank required plenty of cushion from Grace in order to make the loan in the form and in the amount that it did. Through Grace's wilful and wanton fraudulent misrepresentation by omission the bank was induced to loan Grace the money without the cushion it thought it had. Had lady luck not intervened the deal still might have worked: the Thomasville wells might well have performed as expected; the price of gas might have gone up as many expected it would; and interest rates might have remained stable. On the other hand had Centex not found out that the Southwest Piney Woods field was dry prior to the loan closing, and everything else had occurred as it did, the bank would have been in the same position that it currently is, but without a cause of action against Grace. The court therefore finds that the award of seventy-five million dollars is clearly excessive and shocks the conscience.

The decision to make a remittitur in this case is relatively easy. The more difficult question of course is to establish the amount of the remittitur. Due to the size of this punitive damage award and the size of the compensatory damage award, there is little guidance available through common law court precedents. Plaintiff has suggested that treble damage awards of this size under anti-trust law are not unusual. However a mechanical rule of three times compensatory damages, which would mean a remittitur of twenty-five million dollars in this case, does not appear to be appropriate in a common law fraud case. The purpose of the treble damage provisions in anti-trust laws is to encourage private enforcement of the anti-trust laws which is felt to be of great importance to the public. It has also been established by legislative act. In cases of private fraud the interest of the general public is not of such paramount importance and has not achieved legislative attention. Tort cases also do not easily lend themselves to mathematical formulae. Many cases involve outrageous conduct and small compensatory awards. Other cases (such as this one) involve enormous compensatory awards while perhaps less reprehensible conduct.

Considering all of the facts, including the actions of Grace, the harm to the bank, the need to deter Grace and others, a reasonable amount which would punish and deter Grace would appear to be a sum in the neighborhood of twenty-five million dollars.

---

**8.** Grace was excused from posting the normal size bond because of its ability to pay the judgment.

Accordingly, the court orders a remittitur of punitive damages from seventy-five million dollars to twenty-five million dollars. If the remittitur is not accepted by the FDIC, Grace's motion for a new trial will be granted on the issue of damages.

Accordingly, Grace's motion for a JNOV is denied. Grace's motion for a new trial on all issues is denied. Grace's alternative motion for a remittitur is granted and a new trial on the issue of damages will be granted unless the FDIC accepts the remittitur to the sum of twenty-five million dollars.

IT IS SO ORDERED.