**Thomas R. GUY, Administrator of the Estate of Vicki R. Guy, Deceased, Plaintiff,**

v.

**COMMONWEALTH LIFE INSURANCE COMPANY, Defendant.**

**No. DC86–98–S–O.**

United States District Court, N.D. Mississippi, Delta Division.

Nov. 10, 1988.

---

Michael B. McMahan, McMahan and McMahan, Hattiesburg, Miss., Percy L. Lynchard, Jr., Hernando, Miss., for plaintiff.

Dan T. Bing, Luckett Law Firm, Memphis, Tenn., for defendant.

## OPINION

SENTER, Chief Judge.

The plaintiff in this cause seeks contractual and punitive damages for a tortious breach of an insurance contract. This cause was duly tried before the court at a bench trial. The court herein sets forth its findings of fact and conclusions of law. For the reasons set forth below, the court finds that defendant tortiously breached its contract and awards the plaintiff $2,614.00 in contractual damages and $141,000.00 in punitive damages.

## FINDINGS OF FACTS

Vicki R. Guy, plaintiff's decedent, hereinafter referred to as "Guy", was for many years a regular patient of Dr. Henry Wadsworth, Sr., of Hernando, Mississippi. From 1977 through and including April of 1981, Guy used Dr. Wadsworth, Sr., as her regular physician.

The medical records of the Wadsworth Clinic reveal that Vicki Guy saw Dr. Henry Wadsworth, Sr., on April 23, 1981. Her blood pressure was 120/90, her pulse was 82, her temperature was normal. She had pain in the right upper quadrant of her abdomen. He checked her; she was tender over the gallbladder, and her weight was 177 pounds. Dr. Wadsworth made a clinical diagnosis of cholecystitis. He gave her a prescription of Phenobarbitol with Beladonna, fifty (50) pills, to be taken one (1) tablet three times a day. He also gave her a prescription for Tylenol # 2, fifteen (15) pills. He put her on a gallbladder diet.

Dr. Henry Wadsworth, Sr., died in August of 1983.

Application and Issuance of the Policy

Prior to October of 1984, Vicki Guy sought a health insurance policy. She discussed this with Tim Ball, an agent for Farm Bureau Insurance Company, and with Tim Walton, the agent for Commonwealth. She had known Tim Walton all of his life. She chose the Commonwealth policy because there was no deductible and for the benefits that it paid.

Walton started with Commonwealth approximately two months before taking Vicki Guy's application on October 8, 1984. He received no training, no schooling, and no instructions from Commonwealth, but did receive some type of product manual to learn about the products offered by Commonwealth. Walton was paid strictly on commission. He was to receive approximately 40 percent of annual premiums collected as his pay. If no sales were made, he would receive no pay.

On October 8, 1984, Walton contacted Vicki Guy at her place of business for the purpose of selling her an insurance policy. This was the first time in her life that she had ever applied for an insurance policy for either medical or life insurance. Guy testified that Walton, during the taking of her application, only asked her address, social security number, date of birth, and nothing else. Guy testified further that Walton filled out the remainder of the application without asking her another question. Guy signed the application after Walton filled it out, but claims she never read it.

The application needs to be discussed in detail. On page 2 of the application, there are a number of questions that are to be answered by marking boxes labeled "yes" or by marking boxes labeled "no." Question C was the following: In the past five years, [have you] consulted or been treated or examined by any physician or practitioner:

(1) not named below?

(2) for any cause not recorded above.

Neither the "yes" box nor the "no" box was marked.

Page 3 of the application contains a section "AGENTS REPORT—EACH QUESTION TO BE ANSWERED FULLY BY THE AGENT." Under that heading are questions to be answered by marking either a "yes" box or a "no" box. The first question contained two subparts asking whether the agent had requested an x-ray of the proposed insured and whether the agent had requested an EKG of the proposed insured. Neither of these questions was answered by marking either the "yes" box or the "no" box on each question.

Question 4 under this section asked:

Did you give the applicant:

a. Buyer's Guide

b. Medical information Bureau and Consumer Report Notices.

Although the "yes" box was marked for the (a.) question, Walton admitted that he did not leave a Buyer's Guide with Guy. Walton admitted he was not even sure that he knew what a Buyer's Guide was. The subpart (b.) question was not answered by marking either the "yes" box or the "no" box. [Exhibit P1–B.] The claims file indicated that on October 15, 1984, the application was sent back to Walton because question "H. INSURANCE IN FORCE" had not been answered, but Walton had no recollection of not answering question "H."

The application listed Vicki Guy's weight as 142 pounds, but in a telephone interview two weeks later, Guy gave her weight as 180 pounds. Walton could not remember asking the weight question. Walton had no recollection as to why these various questions were either unanswered or answered inaccurately.

Vicki Guy testified in her deposition that if in October of 1984 she had been asked whether she had ever had an indication of or had been treated for a disorder of the gallbladder, she would have answered that she had not been treated for a disorder of the gallbladder, but had known indications of a gallbladder problem.

Walton testified that it was his normal habit or routine, developed over the years, to ask the health questions. He stated that he could think of no reason why he would not have asked Vicki Guy those questions, but had no specific recollection of taking this application. The court finds that the incomplete application and Walton's lack of recall show that Tim Walton did not ask any health questions of Vicki Guy when he took her application, but that he undertook to answer such questions himself.

Walton testified that he gave a receipt to Vicki Guy for the first month's premium payment made by her. The receipt was a printed form attached to the application. On the back of the receipt were notices regarding an "investigative Consumer Report" and the "Medical Information Bureau."

Walton forwarded the application to Commonwealth. Someone at Commonwealth noticed that question "H" on the application relating to insurance in force had not been filled out and returned it to Walton to be completed. "None" was written in this section, and the application was returned to Commonwealth. The application was then examined by an underwriter at Commonwealth who noticed that questions C1 and C2 of the application relating to prior medical visits in the past five years had not been answered. The underwriter requested a health questionnaire interview. In accordance with this request, Kelly Bishop, of Commonwealth, made a telephone call to Vicki Guy, which Guy admits receiving. Guy states that during the telephone interview, she answered questions regarding her health. The questionnaire reflects that Guy advised Bishop that she had last seen Dr. Wadsworth approximately three years before for a "cold." The questionnaire does not mention any problem of the gallbladder. Guy testified that she told the caller that she could not remember exactly why she had gone to the doctor, but she thought it was for a cold. The questionnaire records the response to the question: "Have you had an illness or medical condition in the past ten years requiring you to consult a doctor?", as being no. This answer is inconsistent with that to the preceding question concerning Guy's last visit to a doctor. Guy testified that she was not

asked this question. [See pages 43–48 of Guy Deposition.]

The policy was issued by Commonwealth and delivered to Guy with the application attached. The telephone questionnaire was not attached to the policy. This court has held that the failure to attach the telephone questionnaire means that Guy was not bound by any statements contained therein. *See* Order Denying Motion to Reconsider and Allowing Amendment of Answer, August 11, 1988. *See also* Miss.Code Ann. § 83–9–11(1).

The first page of the policy contained a notice which states:

We issue your policy on the basis that the information on your application is correct and complete. Check this information carefully. If it is not correct and complete or if any past medical history has been left out, write it to our home office.

The undisputed testimony in this case is that Commonwealth utilizes the Lincoln National Underwriting Manual as a guideline for the evaluation of underwriting policies. However, the underwriter is not bound by the recommendations of the manual, but uses it together with his own judgment of the circumstances in underwriting any policies in the event an insured suffers from cholecystitis. The manual recommends either: (1) to rate the policy; (2) to issue a waiver or rider; or (3) to not issue the policy, depending on the circumstances. If the episode occurred from two to five years prior to issuance of the policy, then the recommendation is for a 50 percent premium increase, although this is within the discretion of the underwriter. In this case, David Banks, vice-president of Commonwealth and manager of the underwriting department, stated that if he had been aware in 1984 that Vicki Guy had been diagnosed as having Cholecystitis in 1981, he would have issued a waiver excluding coverage for any gallbladder problems. Sonja Overbee, an underwriter for American General Insurance Company, testified that under the circumstances, American General would not have issued a policy under their standards although they also use the Lincoln National Underwriting Manual and their policy was less liberal than Commonwealth's policy. Neither David Banks nor Sonja Overbee was involved in the decision to issue the policy to Guy.

### Processing the Claim and Recision of The Policy

According to Vicki Guy's testimony, she went to Dr. Brown Brooks on Monday, May 6, 1985, for severe pain. He wanted to put her in the hospital that evening, but she told him she had to cancel appointments at her beauty shop and make arrangements for a substitute bus driver to drive her route. She told Dr. Brooks she would return Thursday. However, she could not stand the pain, went back in on Wednesday, and had the surgery on Thursday, May 9, 1985. [See page 50 of Guy's deposition.]

The hospital notes state: "For the past week to ten days, this patient has had severe right upper quadrant pain associated with mild nausea, but no vomiting. Outpatient ultra-sound of the gallbladder revealed Cholelithiasis. She is admitted to the hospital for urgent Cholecystectomy. She has been in constant pain for the past thirty-six hours."

On May 9, 1985, Guy underwent surgery by Dr. Brown Brooks, of Memphis, Tennessee, for the removal of her gallbladder due to chronic Cholecystitis and Cholelithiasis. [Exhibit P–1A, pps. 6, 8, 9, 16, 17, 19.] The bills totaled approximately $4,772.00, of which the amount of $2,614.00 was covered by the policy.

On June 12, 1985, Commonwealth, by Deborah Peck, wrote to Dr. Brooks inquiring about the diagnosis of Chronic Cholecystitis with Cholelithiasis. On July 1, 1985, Brooks wrote Commonwealth stating:

Vicki Guy was first examined in my office on May 6, 1985, upon referral from Dr. Henry Wadsworth, Jr. of Hernando, Ms. with a tentative diagnosis of cholelithiasis. The patient had been in severe pain for the past several days and her out-patient ultra-sound examination revealed multiple gallstones in the gallbladder. The patient was never aware of

this diagnosis prior to this examination. She was admitted to the hospital several days later for the needed cholecystectomy and although the Pathology Report indicates chronic cholecystitis you will note from the Operative Report this was an acute condition with marked inflammation of the gallbladder. To my knowledge this patient had no prior knowledge of this condition until the examination on May 6, 1985.

Because Guy had been referred to Dr. Brooks by Dr. Wadsworth, Penny Childress wrote Dr. Wadsworth on July 9, 1985, for additional medical records. He responded with a handwritten note, which was received by Commonwealth on July 17, 1985, that the patient had not been seen since April, 1981.

Sherry Cockran, of Commonwealth, wrote another letter to Dr. Wadsworth requesting the records. Dr. Wadsworth returned the letter with a typed note, received by Commonwealth on August 13, 1985, that Wadsworth Clinic needed a release signed by the patient and that the copy of the insurance claim form by Dr. Brown Brooks would not be enough. [Exhibit P–1A, pps. 21, 22, 23.]

On August 28, 1985, Commonwealth received an executed authorization purportedly signed by Vicki Guy on August 23, 1985. [Exhibit P–1A, p. 26.] Guy denied signing an authorization. [See pages 41–42 of Guy deposition.]

Sometime after receiving the August 28, 1985, authorization, Commonwealth sent the authorization to Wadsworth Clinic and received a copy of a 5 × 7 card which is purportedly the entire medical record of Vicki Guy at the Wadsworth Clinic. [Exhibit P–1A, p. 25.]

On September 13, 1985, there is a note from Penny Childress to the file stating: "Please note reply to CM7 and where I have marked. Do you agree it is pre-existing?" On the same day, Carol Mattingly, the unit chief for processing claims, wrote a note to Darlene LaReau, the supervisor of the accident and health claims, stating: "Do you agree that this condition is pre-ex-

isting and the policy should be rescinded?" LaReau replied "I agree."

All of these remarks were apparently prompted by the records from the Wadsworth Clinic that indicated that on April 23, 1981, three and one-half years before the application date in October, 1984, Guy had visited her doctor. The clinic notes stated "pain over RUQ (right upper quadrant). Tender over Gall B. (Bladder.) 177# (177 lbs.) Dx: cholecystitis...."

Penny Childress sent out a form letter from Commonwealth on September 16, 1985, with copies to all the medical providers that it was denying the claim because of a "pre-existing condition." The letter stated:

The charges submitted were for a pre-existing condition. According to the terms of your policy, during the first two policy years your policy is in full force, benefits will not be payable for expenses incurred as a result of a pre-existing condition.

The definition of "pre-existing condition" contained in the defendant's policy is as follows:

A pre-existing condition is a condition for which a covered person received medical advice or treatment from a physician within two years prior to the date of issue of your policy.

The testimony is uncontradicted that Vicki Guy had last seen a physician in March, 1981, over three and one-half years prior to the issue date of the policy (October 8, 1984). Therefore, there is no question that the reason given for the denial of the claim on September 16, 1985, was contrary to the express provisions of defendant's own policy.

On or about September 30, 1985, defendant received a letter from Dr. Henry Wadsworth, Jr., which stated:

Vicki Guy was seen by my father, Dr. H.M. Wadsworth, Sr. (now deceased) on the 23rd of April, 1981. She was afebrile but had pain and tenderness in her right upper quadrant. He made the clinical diagnosis of cholecystitis. Since she was never seen again, there was no confirmation of this diagnosis by x-rays or cholecystogram.

On October 3, 1985, Penny Childress wrote a note to Carol Mattingly which stated:

Please note patient was treated for cholecystectomy in 5–85. Dr. Wadsworth states he saw her on 4–23–81 for possible cholecystitis but never diagnosed it was that. Please advise if payable. Thank you.

On October 4, 1985, Carol Mattingly wrote to Darlene LaReau the following:

See inquiry dated 9–13–85; Dr. Lucy agrees cholelithiasis/cholecystitis is pre-existing & policy should be rescinded as Insured did not acknowledge 1981 incidence of illness in response to question on application asking if any treatment or indication within 5 years. Application is dated 10–8–84. We have letter from Dr. Wadsworth dated 9–30–85 which indicates diagnosis was not confirmed in 1981 and I note that Dr. Brooks said in his letter dated 7–1–85 that insured had no knowledge of condition prior to 5–6–85. It is pre-existing but I need confirmation again that benefits are to be denied & policy rescinded before I proceed. Thank you, Carol Mattingly.

In reply, Darlene LaReau wrote: "I agree with you Carol. Proceed. ADL 10/4/85." There is also another note written by Mattingly on the same sheet that stated "per Donna Alvey 10/7/85 agreed."

The court notes that Mattingly's note refers to plaintiff's failure to acknowledge the question dealing with treatment or indication within five years. The only questions on the application about a five-year period are questions C1 and 2 which were left blank. Mattingly testified that she "assumed" the blank response meant no.

Carol Mattingly said that the claim was handled in defendant's usual manner. She admitted that it was not Commonwealth's procedure to interview the agent before denying a claim on the basis of material misrepresentation in the written application. She testified Tim Walton had not been interviewed by Commonwealth in this case at any time. Walton was not contacted even though the defendant's own files reflected that a number of questions were not answered on the application. In addition, the application showed a weight of 142 pounds, but the telephone interview showed a weight of 180 pounds only two weeks later. When asked why she did not interview the agent, she replied that it just was not "procedure." Mattingly also said it just was not "procedure" to interview or contact the insured before denying a claim on the basis of material misrepresentation on the written application to give the insured an opportunity to explain any inconsistencies in the application.

Mattingly stated she questioned Dr. Brooks' letter of July 30, 1985, when he said that to his knowledge Guy had no prior knowledge of her diagnosis prior to May 6, 1985, but she never called Dr. Brooks to get answers to her questions because it just was not "procedure."

Mattingly also questioned Dr. Henry Wadsworth, Jr.'s letter of September 30, 1986, when he said that the diagnosis in 1981 was a clinical diagnosis and since Guy was never seen again, there was no confirmation of the diagnosis by x-rays or cholecystogram. However, she never called Dr. Wadsworth to personally interview him because it just was not "procedure."

According to Mattingly, prior to the September 16 denial letter, no medical doctor was consulted. The only doctor consulted was an in-house doctor, Dr. Lucy. Mattingly said the reason to deny the claim was based on the insurance claim forms which showed a diagnosis of "chronic cholecystitis with cholelithiasis" in spite of Dr. Brooks' personal letter explaining that he had operated for an acute inflammation of the gallbladder. Mattingly concluded that she felt the handling of the claim was proper and that the claim should be denied. Mattingly did not know about any duties under Mississippi law to interview agents and insureds prior to denying a claim on the basis of material misrepresentations.

On October 10, a form letter was prepared to be sent to Vicki Guy to rescind her policy. The letter included the following language:

The facts in this case indicate that you were treated for cholecystitis in April 1981 by Dr. Wadsworth.

Had the above treatments, attentions and the conditions occasioning same been indicated on the application, the policy would not have been issued as the Insured was not a risk acceptable to our Company. The insurance is, therefore, declared to have never taken effect and we are enclosing our check in the amount of $555.21, representing a refund of all premiums paid in full discharge of our liability in this matter.

Instead of mailing the letter to Vicki Guy, as was done with the September 16 denial letters, this letter was sent to defendant's Memphis office with instructions to deliver the original of the letter and the check to Ms. Guy. When asked why the letter was not mailed directly to Guy or sent by registered mail, Carol Mattingly replied that it just was not "procedure." Walton testified that he did not remember seeing the October 10 letter, but that his boss did give him the premium refund check. Walton was certain that he mailed the refund check to Vicki Guy the day that he was given the refund check. The postmark date on the envelope in which the check was enclosed was November 16, 1985. Defendant offered no explanation as to Walton's insistence that he did not receive the refund check until November 16, 1985.

Vicki Guy stated that she received the refund check in a brown envelope and that there was no letter with the check. The reason given on the check was that it was for "[r]efund of all premiums; Insurance was declared to have never taken effect. # 217189H, Vicki Guy." She testified the first time she ever saw the letter dated October 10, 1985, was when the defendant took her deposition in December, 1986. Vicki Guy took the check to her lawyer, Percy Lynchard, the very next day after she received it in late November. [Pages 56–57 of Guy deposition.] After taking the check to her lawyer, neither Vicki Guy nor her lawyer, nor anyone on Vicki Guy's behalf, made any further communication with Commonwealth until this lawsuit was filed in June of 1986.

## The Pleadings

Plaintiff's complaint filed in May, 1986, alleged that the defendant failed to pay a claim without a legitimate or arguable reason to do so under Mississippi law. She further alleged that the defendant's acts were grossly negligent and that defendant acted with reckless disregard for contractual rights. Plaintiff sought benefits in the stipulated amount of $2,614.00, plus extra-contractual damages for attorney's fees, emotional distress, and for punitive damages.

The defendant filed an answer with general denials and also raised three affirmative defenses which defendant has the burden of proving. The affirmative defenses plead by defendant were the following:

### First Affirmative Defense

Plaintiff provided materially false information related to the claim in her application to Commonwealth, and such material misrepresentation is sufficient to void the policy ab initio. Plaintiff may not recover on a void policy.

### Second Affirmative Defense

At the time of the application for the policy, plaintiff had a pre-existing condition which was materially related to the medical problems for which she made claim and thus [the medical problems] were not covered by the policy.

### Third Affirmative Defense

Plaintiff violated the terms and conditions of the policy and is thus precluded from recovery in any amount.

Plaintiff subsequently filed Requests for Admissions, and defendant filed the following responses to certain pertinent requests for admissions:

### Request to Admit # 5

There was no information in the claims file of Commonwealth Life Insurance on September 16, 1985, indicating that Vicki Guy had received any medical advice or treatments from a physician within two years prior to October 8, 1984.

RESPONSE: Denied. Cholecystitis is a chronic condition and it would be expected that under normal conditions and for normal people, such additional treatment is probable.

### Request to Admit # 7

According to the definition of "pre-existing condition" contained in the policy of Commonwealth Life Insurance Company issued to Vicki Guy, Vicki Guy's claims were not for a "pre-existing condition."
RESPONSE: Denied.

At no time prior to trial or during trial did the defendant offer to amend its pleadings concerning the "pre-existing condition" defense, although in opening statements to the court, counsel for defendant conceded for the first time that Vicki Guy did not have a "pre-existing condition" according to the terms of defendant's policy and offered defendant's apology for five letters sent on September 16, 1985, denying plaintiff's claims for a pre-existing condition. However, counsel for the defendant argued that the denial of plaintiff's claims was proper because plaintiff made a "material misrepresentation" on her application and in a telephone interview.

### CONCLUSIONS OF LAW

#### The Contract Claim

 Commonwealth contends that it has no liability under its contract with Vicki R. Guy because she failed to inform Commonwealth that she had been diagnosed as suffering from cholecystitis in 1981 and had therefore made a material misrepresentation. The court has found that Commonwealth's agent, Tim Walton, did not ask Mrs. Guy any question concerning her health during the initial application.

The court has also found that § 83-9-11(1) prevents Mrs. Guy from being bound by misrepresentations (if any) in the telephone interview.[1] Mrs. Guy clearly did not make any affirmative misrepresentation of fact which would justify recision of the policy.

Commonwealth contends that because the language of the policy requires that Guy review the application, Guy had a duty to inform the company of the errors in the application. Commonwealth argues that by failing to inform the company of the errors, Guy adopted those erroneous statements as her own.[2] In *Home Insurance Company of New York v. Thornhill*, 165 Miss. 787, 144 So. 861 (1932), the Supreme Court of Mississippi faced a similar question. The court adopted the statement:

> If the agent of an insurance company undertakes the preparation of an application for insurance in his company, and, by mistake or omission, fails to write down correctly the applicant's answer to a question propounded, the company will be bound by such answer, just as if it had been written down in the language used by the applicant, and presented thus to the company for its action.

> The rule that the insured is not responsible for false answers in the application where they have been inserted by the agent through mistake, negligence or fraud, is not absolute. The decisions supporting the doctrine are usually based on the theory that the insured has acted in good faith throughout, and that the false answers were inserted without his knowledge and consent.... But the insured is not chargeable with such negligence as will render him liable for false answers inserted by the agent merely because he signed the application in

---

1. Guy testifies that she was not asked the question concerning treatment within ten years during the telephone interview. An examination of the form shows that the "answer" recorded thereon contradicts the answers to earlier questions. The court finds that Vicki Guy did not answer this question and made no misrepresentation thereby.

2. Commonwealth relies on *Reserve Life Insurance Co. v. Brunson*, 252 Miss. 20, 172 So.2d 571 (1965), to support this proposition. *Brunson* is

contrary to the weight of authority in Mississippi that signature in reliance on the agent does not bind the insured to the agent's misrepresentations. Moreover, *Brunson* affirmed the judgment of the circuit court awarding damages because the defendant failed to show that the misrepresentation was material. Considering *Brunson* in light of subsequent decisions, the court finds that *Brunson* is entitled to little or no weight.

blank and trusted to the agent to fill it out, or because he signed an application filled out by the agent without reading it. *Thornhill*, 144 So. at 862 (citations omitted). *See Kirkland v. Prudence Mutual Casualty Company*, 186 So.2d 485 (1966); *Jefferson Life & Casualty Company v. Johnson*, 238 Miss. 878, 120 So.2d 160 (1960); *World Insurance Company v. Bethea*, 230 Miss. 765, 93 So.2d 624 (1957). *Cf. National Life and Accident Company v. Miller*, 484 So.2d 329, 333–36 (Miss.1985). The court concludes that Guy should not be deemed to have adopted the false statements made by Commonwealth's agent.

Accordingly, the court finds that Vicki Guy made no material misrepresentations and that Commonwealth Insurance Company was not entitled to rescind the contract. Commonwealth is liable to Vicki Guy for contractual damages in the sum of $2,614.00.

### The Tortious Breach of Contract Claim

In an action for tortious breach of an insurance contract, the insured must prove "by a preponderance of the evidence either (1) that the insurer acted with malice, or (2) that the insurer acted with gross negligence or reckless disregard for the rights of others" before punitive damages may be recovered. *Aetna Casualty and Surety Co. v. Day*, 487 So.2d 830, 832 (Miss.1986). *See also Mutual Life Insurance Company of New York (MONY) v. Wesson*, 517 So.2d 521 (Miss.1987); *Blue Cross and Blue Shield of Mississippi, Inc. v. Maas*, 516 So.2d 495, 498 (Miss.1987). However, punitive damages will not lie if an insurance company has a legitimate or an arguable reason for failing to pay a claim. *Standard Life Insurance Co. v. Veal*, 354 So.2d 239, 248 (Miss.1977). In a separate opinion, Justice Robertson has defined an arguable reason as

> ... one in support of which there is some credible evidence. There may well be evidence to the contrary. A person [or insurer] is said to have an arguable reason for acting if there is some credible

evidence that supports the conclusions on the basis of which he [or it] acts. *Blue Cross and Blue Shield of Mississippi v. Campbell*, 466 So.2d 833, 851 (Miss. 1984).

The evidence for pre-existing condition consisted of a single entry in Dr. Brown Brooks' records "referred by Dr. Wadsworth with diagnosis of cholelithiasis." In light of Dr. Wadsworth's response to Commonwealth's inquiry which stated that Guy had not been seen in his clinic for more than three years, this entry does not provide an arguable reason to deny the claim. The evidence on material misrepresentation is no stronger, consisting of (1) an *assumption* by Commonwealth's claims staff that an unanswered question was answered falsely and (2) an inadmissible and internally contradictory telephone questionnaire. The court concludes that Commonwealth lacked an arguable reason to deny Guy's claim.

The mere fact that an investigation of a claim is deficient or incompetent is not sufficient to establish malice, gross negligence or reckless disregard of the rights of the insured. *Fedders Corp. v. Boatright*, 493 So.2d 301, 312 (Miss.1986); *Bellefonte Insurance Co. v. Griffin*, 358 So.2d 387, 391 (Miss.1978). This is true even where an underwriter could have done more. *O'Connor v. Equitable Life Assurance Society of the United States*, 592 F.Supp. 595, 598 (N.D.Miss.1984), or where clerical mistakes result in a negligent denial of a claim. *Consolidated American Life Insurance Co. v. Toche*, 410 So.2d 1303, 1306 (Miss.1982).

Mississippi law imposes upon insurance companies a clear duty to promptly and adequately investigate an insured's claim before denying it. *Life and Casualty Insurance Co. v. Bristow*, 529 So.2d 620, 623 (Miss.1988). To adequately investigate a claim, an insurance company must (at a minimum) (1) check to see if the policy provision relied upon to deny the claim has been held invalid and unenforceable by a state or federal court,[3] (2) interview its

---

**3.** *See Employers Mutual Casualty Co. v. Tompkins*, 490 So.2d 897 (Miss.1986). *See also Rich*

employees and agents to determine whether they possess any relevant knowledge regarding the claim in question,[4] and (3) if the claim is related to the plaintiff's health, then make reasonable efforts to obtain all available medical information relevant to the claim.[5]

The requirement to investigate promptly does not mean a mere delay in investigating a claim will support an award of punitive damages. Such an award is supported only if the delay is so unreasonable as to constitute an independent tort or amounts to a constructive denial of the claim, made without an arguable reason and in bad faith. *Tutor v. Ranger Insurance Co.*, 804 F.2d 1395, 1398–99 (5th Cir.1986) (applying Miss. law); *Aetna Casualty and Surety Co. v. Day*, 487 So.2d 830, 833 (Miss.1986).

■ In this case, Commonwealth made no attempt to interview the agent who took the application even though the application was obviously incomplete. On those questions which were left unanswered, Commonwealth "assumed" that the applicant had made false answers. The only reason communicated to Guy for the denial of the claim was that of "pre-existing condition". Although Commonwealth claims that a letter was sent with the check to inform Guy of the basis for recision, neither Walton nor Guy recalled having seen such a letter. The entry on the check stated:

> Refund of all premiums: Insurance was declared to have never taken effect. # 217189H, Vicki Guy.

This entry fails to explain the reason for the recision of the contract. The court finds that the only reason for denial of the claim communicated to Guy was that in the September 16, 1985, letters setting forth pre-existing condition as the basis for denial. The court finds an award of punitive damages is justified by the facts in the cause.

## Calculating an Award of Punitive Damages Under Mississippi Law

Once it is established that punitive damages in some amount should be allowed, the quantum thereof is determined by reference to the following objectives: (a) punishing the wrongdoer for his actions, (b) deterring the wrongdoer from engaging in such conduct in the future, (c) deterring others from engaging in such conduct in the future by making an "example" out of the wrongdoer, and (d) rewarding the injured party for bringing suit, thereby protecting the public from future wrongdoing. Factors to be considered in arriving at a final amount include, *inter alia*, the degree of the offense, the presence or absence of malice, the motive behind the actions, the injury intended, and the public sense of justice and propriety. Although a wrongdoer's financial net worth is important, whether he has been sued for punitive damages before is likewise relevant. *See generally Mutual Life Insurance Company of New York v. Wesson*, 517 So.2d 521 (Miss.1987); *Blue Cross and Blue Shield v. Maas*, 516 So.2d at 496–497; *Bankers Life and Casualty Co. v. Crenshaw*, 483 So.2d 254 (Miss.1985).

■ A finding of malice on Commonwealth's part is not supported by the record. Nevertheless, the motive behind the insurer's actions was clear: it intended to save money by denying a claim. Moreover, such actions were done with wanton disregard for the rights of the insured in that the insured was assumed to have lied when a question on the application was left unanswered. Impairment of the plaintiff's ability to manage her affairs was a clearly foreseeable result of the denial. The use of an insurer's superior position to wrongfully deny a claim offends the public sense of justice and propriety. Commonwealth has tendered a financial statement listing

---

ards v. Allstate Insurance Company, 693 F.2d 502 (5th Cir.1982) (applying Mississippi law).

**4.** *See Merchants National Bank v. Southeastern Fire Insurance Co.*, 751 F.2d 771 (5th Cir.1985) (applying Mississippi law).

**5.** *See Life Insurance Company of Mississippi v. Allen*, 518 So.2d 1189 (Miss.1987); *Bankers Life and Casualty Company v. Crenshaw*, 483 So.2d 254, 271–73 (Miss.1985); *Blue Cross and Blue Shield of Mississippi v. Campbell*, 466 So.2d 833 (Miss.1984); *Reserve Life Insurance Co. v. McGee*, 444 So.2d 803 (Miss.1983).

its net worth at roughly $141,000,000.00. The plaintiff did not show that Commonwealth had been penalized previously for tortious breach of an insurance contract.

Based on the circumstances of this case, the court finds that the plaintiff is entitled to an award of punitive damages in the amount of $141,000.00. This amounts to roughly the same percentage of net worth as that awarded in *Reserve Life v. McGee.* The objectives of punishment and deterrence are served, and the plaintiff is amply rewarded for bringing a wrongdoer to account. The court is confident that this award will get the attention of Commonwealth and other insurance company officials.

Constitutionality of Punitive Damage

Commonwealth attacks the award of punitive damages based on (1) the obligations of contract clause of Article 1, Section 10, (2) the excessive fines clause of the eighth amendment, and (3) the due process clause of the fourteenth amendment. Each of these contentions will be examined separately.

## OBLIGATION OF CONTRACT

■ It is well established that the obligations of contract clause applies only to the enactment of statutes and not to judicial decisions. *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953); *Kryger v. Wilson,* 242 U.S. 171, 37 S.Ct. 34, 61 L.Ed. 229 (1916). Awards of punitive damages for tortious breach of contract are a part of Mississippi common law. *See Eichenseer v. Reserve Life Insurance Co.,* 682 F.Supp. 1355, 1361–1365 (N.D.Miss.1988). The obligations of contract clause does not apply to this doctrine.

## EXCESSIVE FINES

■ The eighth amendment is generally considered applicable in the context of criminal proceedings alone. *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). Civil penalties such as statutory multiple damages, fixed and variable fines, and civil forfeitures have all been held enforceable in civil proceedings. *See Electro Services, Inc. v. Exide Corp.,* 847 F.2d 1524, 1530–31 (11th Cir.1988);

*Federal Deposit Insurance Corp. v. W.R. Grace & Co.,* 691 F.Supp. 87, 98 (N.D.Ill. 1988) (hereinafter FDIC). The court finds that the eighth amendment excessive fines clause is inapplicable to the imposition of punitive damages in a tortious breach of contract suit.

## DUE PROCESS

■ Commonwealth contends that Mississippi's allowance of punitive damages is improper because it allows the jury 'unfettered discretion' in setting a punitive damages award. The court has noted above that the following factors must be considered in setting an award of punitive damages in an action for tortious breach of an insurance contract: (1) the tortfeasor's financial net worth; (2) the degree of the offense; (3) the presence or absence of malice; (4) previous awards of punitive damages against the tortfeasor; (5) the motive behind the actions; (6) the injury intended; (7) the public sense of justice and propriety. *See generally Mutual Life Insurance Company of New York v. Wesson,* 517 So.2d 521 (Miss.1987); *Blue Cross and Blue Shield v. Maas,* 516 So.2d at 496–97; *Bankers Life and Casualty v. Crenshaw,* 483 So.2d 254 (Miss.1985). These factors act to limit jury discretion. *FDIC,* 691 F.Supp. at 98–100. The allowance for motions for new trial and J.N.O.V. within the Mississippi Rules of Civil Procedure and the practice of additur and remittitur at both the trial and appellate levels also act to limit the discretion of the jurors and prevent unfair awards of punitive damages. *Id.* at 100. Mississippi's law of punitive damages does not violate the due process clause.

## CONCLUSION

The court finds that Commonwealth tortiously breached its contract of insurance with Vicki R. Guy and awards $2,614.00 in actual damages and $141,000.00 in punitive damages.

An appropriate order shall issue.